[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15337

_____

D.C. Docket No. 6:11-cv-00824-ACC-DAB

FRANCIS R. CARTER, JR.,

Plaintiff - Appellant,

versus

CITY OF MELBOURNE, FLORIDA,
DONALD L. CAREY,
JACK M. SCHLUCKEBIER,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 23, 2013)

Before BARKETT and MARCUS, Circuit Judges, and HUCK,[*] District Judge.

_____

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of
Florida, sitting by designation.

PER CURIAM:

Francis R. Carter appeals the district court's grant of summary judgment in favor of the City of Melbourne, Donald L. Carey, and Dr. Jack M. Schluckebier. Carter brought suit under 42 U.S.C. § 1983 after he was fired from the City of Melbourne Police Department for violating department policies. Carter's suit asserts that he was actually fired because he engaged in protected political speech, in violation of his First Amendment rights, and that the City and the individual defendants caused him to be falsely arrested, imprisoned, and prosecuted. Upon review of the record, we conclude that the district court did not err in granting summary judgment in favor of the City and the individual defendants.

## I. Background

For the purposes of summary judgment, "our analysis . . . must begin with a description of the facts in the light most favorable to the plaintiff and our decision must accept those facts." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013) (quotation marks omitted).

Carter served as an officer in the City of Melbourne Police Department for twenty-two years before he was fired in 2010 and had always been active in the local chapter of the police union and Melbourne politics.  It is these activities which he alleges were the impetus for disciplinary actions taken against him and his ultimate firing. As a member of the police union, Carter opposed the decision

2

of the city manager, Dr. Schluckebier, to hire Carey as chief of the police department in 2003. Carter continued his opposition to Carey after becoming president of the Melbourne chapter of the police union in 2009, running on a platform of confronting Chief Carey about morale and disciplinary issues within the police department.

In addition to his union activities, Carter also campaigned for City Council candidates and lobbied members of the City Council, focusing his efforts on issues affecting police officers and attempting to have Chief Carey removed from office. He raised money and publicly campaigned for at least two successful candidates for the City Council, hoping that those candidates would be supportive of police officers and the union's agenda. Carter also cultivated relationships with sitting members of the City Council, meeting with them socially after Council meetings to advocate for the union's interests and to apprise City leaders of what he perceived to be low morale among officers in the police department. Carter also complained in private to City Council members about Chief Carey. Finally, Carter was publicly critical of Dr. Schluckebier's management of the City and picketed Dr. Schluckebier's neighborhood.

The individual defendants deny that they knew about Carter's political and union activities, but the record suggests otherwise, although the extent of their knowledge is unclear. Chief Carey admitted that Dr. Schluckebier alerted to him to

3

the fact that Carter had opposed his candidacy for chief of police and Chief Carey forwarded Dr. Schluckebier a copy of an email that Carter had written in support of specific City Council candidates. Chief Carey also admitted to being generally aware of Carter's political activities regarding City Council candidates and the City Council. For his part, Dr. Schluckebier sent an email to Chief Carey referencing Carter's lobbying of City Council members, specifically referring to those efforts as "improper." Chief Carey also reported that Dr. Schluckebier was very upset when one of the protests that Carter helped organize targeted his neighborhood.

Starting in November 2009, Carter became the subject of an investigation initiated by the Internal Affairs division of the Melbourne Police Department. Chief Carey instructed Internal Affairs to initiate the investigation after Karen Gregory, Carter's former girlfriend, submitted a complaint that Carter sent her threatening text messages and solicited nude photographs from her. The investigation into Carter's treatment of Ms. Gregory was eventually turned over to the Florida Department of Law Enforcement (FDLE), which ultimately found that the charges were unfounded and the case was dropped in January 2010. Gregory also notified Chief Carey that Carter and other officers used a free apartment to sleep and relax while on duty. An Internal Affairs investigation found that Carter's use of the apartment violated department policy, and issued discipline in the form of an 80-hour suspension without pay.

In January 2010, Internal Affairs Sergeant Dan Lynch began reviewing the dashboard camera videos from Carter's traffic stops and making note of those stops that appeared to lack justification. Chief Carey specifically asked Sergeant Lynch to check for a "pattern of conduct" related to his review of these stops. Sergeant Lynch found an instance where Carter completed an improper stop and issued what appeared to be a falsified ticket and found several other instances of potentially improper stops and falsified tickets. Because he identified possible criminal violations, Sergeant Lynch turned over his investigation to the FDLE to investigate whether criminal charges should be brought. After conducting an independent review of the dashboard camera videos, the FDLE obtained a warrant and arrested Carter on charges of official misconduct and falsification of records. On March 25, 2010, the State's Attorney for the 18th Judicial Circuit formally charged Carter with misconduct and falsifying records. Shortly thereafter, the Brevard County Sheriff's Department, which had taken over the Internal Affairs investigation into Carter's traffic stops, found that he had violated Melbourne Police Department policy.

While these investigations were ongoing, the local chapter of the police union notified the City that it had passed a vote of "no confidence" in Chief Carey. Carter took no part in drafting the "no confidence" document or announcing the result of the vote to the City Council or Dr. Schluckebier.

In April 2010, Chief Carey announced that he would retire effective January 3, 2011. However, from April 2010 until retirement, Chief Carey was not working and used a combination of paid sick, vacation, and severance leave. Steve Mimbs was appointed as Acting Chief of the Melbourne Police Department while Chief Carey was on leave. On August 19, 2010, Acting Chief Mimbs formally terminated Carter based on the findings of the Brevard County Sheriff's Department investigation. The State's Attorney later dropped all criminal charges against Carter.

## II. Standard of Review

We review de novo a district court's denial of summary judgment, applying the same legal standards that governed the district court. Edwards v. Shanley, 666 F.3d 1289, 1292 (11th Cir. 2012). Summary judgment is appropriate when the record evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). In conducting our review, "we are required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1143 (11th Cir. 2007) (quotation marks omitted).

### III. Municipal Liability

We start by addressing whether there is sufficient evidence in the record to conclude that the City of Melbourne could be held liable for any deprivation of Carter's constitutional rights. In Monell v. New York City Dep't of Soc. Servs., the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. 436 U.S. 658, 694 (1978). Municipal liability is limited "to acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) (quotation marks omitted).  In determining whether a policy or action represents official municipal policy, the court must determine whether the decision at issue was made by "those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989). Our "Court's decisions have consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997).

The City argues that none of the personnel, internal affairs, or disciplinary decisions about which Carter complains was made by a final policymaker for the City such that municipal liability attached. The City points out that Carter had available to him two sources of administrative review which made the decisions about which he complains non-final. Specifically, City policy governing Carter's employment allowed him to administratively appeal the results of any investigation and disciplinary decision to the city manager, who was Dr. Schluckebier at times relevant to this suit. Further, the collective bargaining agreement governing his contract with the police department allowed Mr. Carter to have disciplinary and personnel related decisions reviewed by an independent arbitrator.

Initially, we disagree with the City that that the fact that the collective bargaining agreement gave Carter the right to appeal a disciplinary or personnel decision to an independent arbitrator means that the underlying decision is non-final for purposes of Monell liability. An independent arbitrator, who is not otherwise an employee of the city, is not vested with final policymaking authority for the city.  What our precedents mean by meaningful administrative review is plainly review by a municipal official's superiors. An independent arbitrator's review of a decision by a city employee does not constitute a "review by the municipality's authorized policymakers," City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988), and the underlying decision reviewed by the arbitrator would be

8

final for the purposes of municipal liability (so long as there are no other forms of meaningful review of the decision by <u>city policymakers</u>). As the Ninth Circuit explained, "[t]hat someone outside of the [municipal government] may reverse the . . . official's decision does not mean that the official does not speak for the [municipality] when he or she initially makes that decision." <u>Lytle v. Carl</u>, 382 F.3d 978, 986 (9th Cir. 2004). Indeed, if the City's position were correct, then an arbitrator's ability to resolve a dispute or even a federal court's jurisdiction to hear employment-related claims, pursuant to Title VII or 42 U.S.C. § 1983, would amount to an additional layer of meaningful review, and there would be no such thing as a final policymaker for a municipality. Municipalities could effectively insulate themselves from any liability under a final-policymaker theory simply by providing for arbitration.

We nevertheless conclude that the district court correctly concluded that Carter failed to establish that any of the personnel, internal affairs, or disciplinary decisions about which he complains was made by a final policymaker for the City such that municipal liability attached. Carter failed to present any evidence that Dr. Schluckebier made the decision to fire him or ratified the decision once made by his subordinates. Carter presented nothing more than conclusory allegations at the summary judgment stage, and those unsupported allegations do not suffice to

9

create a triable issue of fact. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th

Cir. 1985). As a result, Carter's Monell claims must fail.

### IV. First Amendment Claims

Carter also argues that the individual defendants caused disciplinary and

personnel actions to be taken against him as a result of his engagement in political

speech protected by the First Amendment. Although a government employer "may

not demote or discharge a public employee in retaliation for speech protected

under the first amendment, a public employee's right to freedom of speech is not

absolute." Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989). As

the Supreme Court has explained

> the State has interests as an employer in regulating the speech of its
> employees that differ significantly from those it possesses in
> connection with regulation of the speech of the citizenry in general.
> The problem in any case is to arrive at a balance between the interests
> of the teacher, as a citizen, in commenting upon matters of public
> concern and the interest of the State, as an employer, in promoting the
> efficiency of the public services it performs through its employees.

Pickering v. Bd. of Ed., 391 U.S. 563, 568 (1968). We apply a four-stage analysis

"[i]n cases where the state denies discharging the employee because of speech."

Bryson, 888 F.2d at 1565. First, we consider "whether the employee's speech may

be 'fairly characterized as constituting speech on a matter of public concern.'" Id.

(quoting Rankin v. McPherson, 483 U.S. 378, 384 (1987)). Only if this threshold

issue is satisfied will the Court then move on to apply the second prong, where we

10

"weigh[] the employee's first amendment interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id. (quoting Pickering, 391 U.S. at 568). Third, "[i]f the public employee prevails on the balancing test, the fact-finder determines whether the employee's speech played a 'substantial part' in the government's decision to demote or discharge the employee." Id. "Fourth, if the employee prevails by showing that the speech was a substantial motivating factor in the state's employment decision, the state must prove by a preponderance of the evidence that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" Id. at 1566 (quoting Mt. Healthy Cnty. Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 286 (1977)).

We start with the threshold inquiry of whether Carter's speech activities related to a matter of public concern. To determine "[w]hether an employee's speech addresses a matter of public concern," the Court must examine "the content, form, and context" of the speech, "as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). The Supreme Court has explained that the purpose of this requirement is to prevent the federal courts from becoming "a roundtable for employee complaints over internal office affairs." Id. at 149. Reflecting this concern, we have emphasized that "a public employee may not transform a personal grievance into a matter of public concern by invoking a

11

supposed popular interest in the way public institutions are run." Ferrara v. Mills, 781 F.2d 1508, 1516 (11th Cir. 1986).

However, contrary to the defendants' arguments and the conclusion of the district court, we do not think that Carter's status as an employee of the police department meant that his speech did not address a matter of public concern. In making the public-concern determination, we always consider the form and context of the employee's speech. Connick, 461 U.S. at 147-48; Bryson, 888 F.2d at 1565. Here, the context and form of Carter's speech activities strongly favor the conclusion that he was speaking as a citizen addressing a matter of public concern. Many of his speech activities were conducted while off duty and included campaigning and fundraising for City Council candidates, lobbying of City Council members, and picketing and handing out pamphlets concerning Dr. Schluckebier's administration of City affairs. Thus, much of Carter's expressive activities constituted the type of "classically political speech" lying at the "core of the First Amendment." Boos v. Barry, 485 U.S. 312, 318 (1988); see Connick, 461 U.S. at 145 (political speech "is the essence of self-government," "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection" (quotation marks omitted)). Moreover, picketing is undeniably a form of core political speech, see Boos, 485 U.S. at 318, as is handing out pamphlets, see Lovell v. City of Griffin, 303 U.S. 444, 452 (1938). In addition, donating or

12

independently spending money to support or criticize candidates for public office "is central to the meaning and purpose of the First Amendment." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 329 (2010); accord Eu v. S.F. Cnty. Democratic Central Comm., 489 U.S. 214, 223 (1989) (the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office" (quotation marks omitted)).

The content of much of Carter's speech activities, which essentially consisted of criticizing the leadership of the police department and Shluckebier, also supports our conclusion. Carter did not simply address "a matter of interest only to [him]," Ferrara, 781 F.2d at 1516, but rather sought to bring about changes that would lead, at least in his eyes, to the more effective operation of the Melbourne police force, an end which has broad impact on Melbourne citizens at large. Moreover, there is no indication in the record that Carter's speech was designed to incite, nor did it encourage or urge fellow officers to disobey superiors' orders or otherwise do anything that would negatively affect the internal order and discipline of the police department. The fact that Carter would be affected by the policy changes for which he was advocating cannot be cause alone to deny him First Amendment protections. The Supreme Court's First Amendment case law has never required a speaker addressing political matters to be disinterested or unaffected personally by the policies he advocates, and indeed

13

such a requirement is wholly inconsistent with First Amendment jurisprudence. See New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) (explaining that the First Amendment "assure[s] unfettered interchange of ideas," and affords the opportunity "for 'vigorous advocacy' no less than 'abstract discussion'"). Therefore, we conclude that Carter has established that he spoke as a citizen on matters of public concern.

We also conclude that Carter has met the second prong of Bryson, which requires that his First Amendment interests outweighed the "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." Bryson, 888 F.2d at 1565 (quoting Pickering, 391 U.S. at 568). As discussed above, much of Carter's speech represents the core of the type of activities the First Amendment seeks to protect. As for the interests of the state, the defendants have not pointed to any way in which Carter's speech threatened the municipality's ability to maintain the orderly administration of public services. Notably, Carter's speech occurred off duty and in the context of political elections. As this Court's case law makes clear, "the context and circumstances of the employee's speech must be considered." Bryson, 888 F.2d at 1565; see Stough v. Gallagher, 967 F.2d 1523, 1528-29 (11th Cir. 1992) (concluding that a demoted deputy sheriff's interests in off-duty political speech outweighed the sheriff's interest in an efficient workplace under Bryson's second

14

step). The record does not contain evidence that Carter's speech interfered with the police department's operations or with internal order and discipline. And while we recognize that "there is a heightened need for order, loyalty, morale and harmony" attendant to the internal governance of a police department, Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000), the government must, at minimum, show that any of those interests are at all threatened by a plaintiff's speech activities, which the defendants have failed to do here. Thus, while it is indeed true that the Melbourne Police Department has an interest in conducting effective internal investigations and meting out discipline where it is appropriate, this interest was not infringed upon by Carter's off-duty political activities.

Nonetheless, we ultimately agree with the district court that Carter's First Amendment claims fail because he cannot establish that he meets the third prong of Bryson, which requires that his speech play a substantial part in the Police Department's decision to conduct Internal Affairs investigations or terminate him. Bryson, 888 F.2d at 1565.  Carter has not pointed us to, and we are unaware of, any evidence which shows that the disciplinary and personnel decisions against him were motivated by his speech activities, rather than the misconduct with which he was charged. As a result, the district court did not err in holding that the individual defendants did not violate Carter's First Amendment rights.

15

**V. False Arrest, Imprisonment, and Malicious Prosecution Claims**

We find that Carter's false arrest, imprisonment, and malicious prosecution claims also fail because he has not presented any evidence that he was arrested without probable cause. Moreover, the evidence cannot be read to establish that there was a causal connection between either of the individual defendant's actions and Carter's arrest, imprisonment, and prosecution. Rather, the FDLE conducted its own investigation and independently decided to arrest and detain Carter. Nor has Carter identified any evidence which shows that either of the individual defendants in this case caused the FDLE to falsely arrest, detain, or charge him by knowingly supplying false information to the FDLE or placing undue pressure on the FDLE.  Thus, neither the individual defendants nor the municipality are liable.

Accordingly, for all the reasons set forth above, we AFFIRM the district court's grant of summary judgment in favor of all the Appellees.[1]

**AFFIRMED.**

---

[1] We do not find that the district court judge abused her discretion in declining to disqualify herself in this case.