Mark WEINSTEIN, Plaintiff,

v.

CITY OF NORTH BAY VILLAGE,
Matthew Schwartz, James McVay,
and Gustavo Cruz, Defendants.

Case No. 13–CV–20064.

United States District Court,
S.D. Florida.

Sept. 26, 2013.

Raymond J. Taseff, Ray Taseff, P.A., Coral Gables, FL, for Plaintiff.

Jeffrey Lawrence Hochman, Christopher J. Stearns, Jr., Johnson Anselmo Murdoch Burke Piper & Hochman PA, Fort Lauderdale, FL, Oscar E. Marrero, Lourdes Espino Wydler, Marrero & Wydler, Coral Gables, FL, for Defendants.

## *ORDER*

PAUL C. HUCK, District Judge.

THIS MATTER is before the Court upon Defendants', City of North Bay Village ("the City" or "North Bay Village"), Matthew Schwartz, James McVay, and Gustavo Cruz, Motions to Dismiss the First Amended Complaint [D.E. Nos. 19, 27, 30, 44]. Plaintiff, Mark Weinstein ("Weinstein"), claims the defendants violated his First and Fourth Amendment rights while Weinstein was a police officer with the North Bay Village Police Department. Weinstein alleges that the defendants retaliated against him because he advocated to change the official union of the police department. The defendants seek dismissal on various grounds, including failure to state a claim, quasi-judicial immunity, qualified immunity, and the intracorporate conspiracy doctrine.

The Court held a hearing on McVay and Cruz's motions on August 8, 2013 and has duly considered all four motions. For the

reasons discussed below, the City's motion is denied, Schwartz's motion is denied, and McVay and Cruz's motions are granted.

## I. BACKGROUND

### A. *Facts* [1]

Weinstein was an officer at the North Bay Village Police Department, along with defendant McVay, a lieutenant, and defendant Cruz, an acting sergeant. First Am. Compl. ¶¶ 9, 11, 12. McVay and Cruz were close personal friends, and, as a lieutenant, McVay was both Weinstein and Cruz's superior officer. *Id.* ¶ 72. Defendant Schwartz was the city manager and had the power to hire and fire City police officers. *Id.* ¶¶ 13, 169–72. McVay also led the local chapter of the Police Benevolent Association ("PBA")—the official union of the police department. *Id.* ¶ 31. In that role, McVay served as the union representative for the officers whom he managed. *Id.* ¶ 11. Political candidates in the City sought endorsements of the PBA, and those endorsements helped several candidates win their elections and receive appointments. *Id.* ¶¶ 38, 40–43.

Police officers began to express discontent with McVay, believing he was using his PBA position for his own political gain and exercising his power as lieutenant to play favorites on the police force. *Id.* ¶¶ 50–51. Officers further worried that McVay's close political connections to the City's leaders created a conflict of interest that could prevent McVay from protecting their interests in disciplinary proceedings against the City. *Id.* ¶ 52.

Eventually the discontent grew into action. Weinstein and other officers spearheaded an effort to change the police un-

ion, creating a chapter of the Fraternal Order of Police ("FOP"), with Weinstein as president. *Id.* ¶¶ 56–62. Sixteen of the twenty-three police officers on the force supported the change, allowing the FOP to become the official bargaining unit of the department. *Id.* ¶ 61, 156.

However, McVay and other supporters of the PBA viewed the FOP as a threat to their political power base. *Id.* ¶ 64. City leaders openly supported the PBA. *Id.* ¶ 65. For example, the mayor wore a PBA pin to a City Commission meeting, causing a ruckus. *Id.* Weinstein claims that the bad blood over the union rivalry resulted in a campaign waged against him. *Id.* ¶ 63. His mailbox at work was vandalized with a drawing that, as Weinstein explains it, was a statement that he was considered a traitor by the PBA supporters. *Id.* ¶ 66. Even though Weinstein reported the incident, nothing was done to bring the vandal to justice. *Id.* ¶ 68.

On February 16, 2009, the problems erupted into a physical altercation between McVay and Weinstein. *Id.* ¶¶ 70, 81. Weinstein and Cruz were working in their offices, which were in temporary space in a double-wide trailer. *Id.* ¶¶ 70–71. McVay entered the trailer and began speaking to Weinstein about the transition of power between the PBA and the FOP and certain promotions on the police force that Weinstein opposed. *Id.* ¶ 75. McVay told Cruz that Weinstein had made a contribution to the mayor and was upset about not being promoted in return. *Id.* ¶ 79. Weinstein told McVay this was a lie. *Id.* ¶ 80. McVay responded by attacking Weinstein, holding him on the ground, and choking him. *Id.* ¶¶ 81–82. During the fight,

---

**1.** The facts set forth herein are drawn from the allegations in the First Amended Complaint, which must be taken as true and construed in the light most favorable to the plain-

tiff. *See World Holdings, LLC v. Fed. Republic of Germany,* 701 F.3d 641, 649 (11th Cir. 2012).

McVay told Cruz to take Weinstein's firearm, which Cruz did. *Id.* ¶ 85.

Once McVay got off of Weinstein, McVay told Weinstein: "This isn't going anywhere. You're not going to say anything. This is going to stay here. This will go bad for you. I'm a lieutenant. You're going to lose. This is going to stay here." *Id.* ¶ 88. Weinstein then turned to Cruz and repeatedly said: "You saw what he did!" *Id.* ¶ 89. Cruz put his hands up and shook his head, as if to say: "What do you expect from me?" *Id.* Weinstein followed McVay's orders and did not report the incident because he feared that McVay would be able to spin the incident to make Weinstein look bad. *Id.* ¶ 90. According to Weinstein, McVay and Cruz also agreed between themselves to conceal what had happened. *Id.* ¶ 91.

McVay soon realized that he had injured his hamstring in the attack and had difficulty walking. *Id.* ¶ 93. He ran into the chief of police, Roland Pandolfi ("Pandolfi"), and other officers, and made excuses for his limp (for example, that he had hurt himself wrestling with his kids), and did not mention the fight. *Id.* McVay went to the hospital and was admitted for compartment syndrome. *Id.* ¶ 94. That evening, he called Weinstein and again ordered Weinstein not to report the incident. *Id.* ¶ 95. However, once McVay learned he would need surgery on his leg, he reported to Pandolfi that Weinstein had attacked him. *Id.* ¶ 96.

Without knowing of McVay's report, Weinstein, too, decided to report the incident. *Id.* ¶ 97. Pandolfi would not listen to Weinstein's side of the story, and instead told Weinstein that he was aware of the incident and that it would be investigated, and instructed Weinstein to remain silent about the incident. *Id.* ¶ 98. According to Weinstein, Pandolfi did not follow police department policy when he would not listen to his complaint about McVay. *Id.* ¶ 99.

About a month later, Schwartz directed that a formal disciplinary proceeding be brought against Weinstein for his role in the fight with McVay. *Id.* ¶ 106. Pandolfi served Weinstein with a notice that he was the subject of an internal affairs investigation, then suspended him with pay, directed him to stay at home during business hours and barred him from off-duty employment. *Id.* ¶¶ 106–08. Pandolfi was apparently following Schwartz's orders in carrying out these disciplinary actions. *Id.* ¶ 106.

Following a factual investigation by the Professional Compliance Bureau of the Miami–Dade County Police Department, Pandolfi, at Schwartz's direction, held a pre-determination hearing on charges of conduct unbecoming an officer and failure to promptly report official misconduct. *Id.* ¶¶ 115–118. Pandolfi found the charges to be sustained, and recommended to Schwartz that Weinstein be suspended without pay for thirty days. *Id.* ¶ 118. Schwartz presided over a final pre-determination hearing, and found Weinstein guilty in violation of City policy and found that Weinstein had committed a battery against a fellow officer, and had failed to timely report the incident. *Id.* ¶ 120. Schwartz suspended Weinstein for 90 days without pay, which included a loss of medical benefits, retirement, and time accruals. *Id.* ¶ 124. Excepting dismissal, this was the most severe suspension in the history of the police department. *Id.* ¶ 125. McVay and Cruz were never disciplined for their roles in the fight, including their failure to report the incident. *Id.* ¶ 126. Weinstein alleges that the disciplinary proceeding was a sham, concocted to retaliate against him for supporting the FOP. *Id.* ¶¶ 122. Pursuant to a collective bargaining agreement, Weinstein appealed the de-

cision to a neutral outside arbitrator and eventually prevailed. *Id.* ¶¶ 129, 134.

Weinstein also claims that many other officers received harsh treatment because they supported the FOP. *Id.* ¶¶ 152–66. For example, Sergeant Kevin Beaty, an FOP supporter, was accused of misconduct but was cleared by the State Attorney's Office and an independent investigator. *Id.* ¶ 157. Nevertheless, Schwartz placed Beaty on administrative leave. *Id.* Schwartz also stated at a meeting that he did not care that Beaty had been cleared and would personally see to it that Beaty was fired. *Id.* Likewise, Detective/Officer Steven Brent, also a FOP supporter, was accused of misconduct but was also cleared by the State Attorney's Office and an independent investigator. *Id.* ¶ 158. Despite this, Brent was reassigned from detective duty to uniform road patrol. *Id.* One detective was demoted because he was an outspoken opponent of the PBA; another was demoted because he confronted McVay about his belief that McVay had a conflict of interest in performing both the duties of a police lieutenant and union representative. *Id.* ¶¶ 159, 160. Similarly, Lieutenant James McCready, a founding member of the FOP, was removed from his internal affairs position. *Id.* ¶ 161. Schwartz also called McCready into his office and threatened him. *Id.* Additionally, Weinstein alleges several specific instances of PBA supporters being treated better by the police department than FOP supporters. *Id.* ¶¶ 163, 164, 166.

## B. *Weinstein's Claims and the Motions to Dismiss*

Weinstein alleges constitutional violations under 42 U.S.C. §§ 1983 and 1985(2) against all defendants. As to the City,

Weinstein alleges that it had a longstanding "custom or practice" of suppressing and retaliating against officers who supported the FOP in violation of their rights to freedom of speech and association (Count I). Weinstein also alleges that Schwartz's suspension of Weinstein was a retaliatory action in violation of Weinstein's First Amendment rights and that the City is responsible for this conduct (Count II). Weinstein also brings a claim against Schwartz individually, based on Schwartz's suspension of Weinstein (Count III).

Weinstein brings Counts IV, VI, VII, and VIII against McVay and Cruz in their individual capacities. First, Weinstein alleges that McVay and Cruz conspired to violate his First Amendment rights for his FOP activities (Count IV). Additionally, Weinstein claims McVay used excessive force in violation of Weinstein's Fourth Amendment rights when he attacked Weinstein (Count VI). Weinstein further claims that Cruz violated his Fourth Amendment rights by not stopping McVay's use of excessive force (Count VII). Count VIII is a common law battery claim brought against McVay.[2]

Each defendant has filed a motion to dismiss. The City argues that Weinstein's First Amendment claims fail because Weinstein has not alleged sufficient factual allegations to support the claim that the City had a "custom or practice" of retaliation. The City further argues that Schwartz was not a final policymaker whose actions could give rise to municipal liability for Weinstein's suspension. Schwartz also argues that he is not a final decisionmaker, and that he is entitled to quasi-judicial immunity and qualified im-

---

**2.** Weinstein also alleges a § 1985(2) violation against McVay and Cruz (Count V). However, at the hearing on August 8, 2013, Wein-

stein's counsel informed the Court that Weinstein was withdrawing this claim.

munity. McVay and Cruz move to dismiss the claims against them, except the battery claim. They argue that the First Amendment claim fails because it is a "shotgun pleading." Additionally, they contend that the First and Fourth Amendment claims are barred by qualified immunity and the intracorporate conspiracy doctrine.

## II. DISCUSSION

### A. *Standard of Review*

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), all factual allegations in the complaint are considered true and are construed in the light most favorable to the plaintiff. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir.2010). Under Rule 8, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief," and "[e]ach allegation must be simple, concise, and direct." Fed. R.Civ.P. 8(a)(2), (d)(1). "[T]he statement need only 'give the defendant fair notice of what the . . . claim is and the ground upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). However, the plaintiff must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[C]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts will not prevent dismissal." *Bell v. J.B. Hunt Transp., Inc.*, 427 Fed.Appx. 705, 707 (11th Cir.2011) (per curiam). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ash-*

*croft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

### B. *The City's Motion to Dismiss (Counts I and II)*

Weinstein's claims against the City are based on two distinct theories of liability under § 1983. First, Weinstein alleges the City violated his First Amendment rights by furthering a "custom or practice" to silence and punish police officers who advocated for the FOP to act as the officers' union (Count I). Weinstein also alleges that the City violated his First Amendment rights when Schwartz suspended him (Count II). The City's arguments for dismissal are discussed below.

1. *Weinstein has Plead Sufficient Facts to Support an Inference that the City had a "Custom or Practice" of Violating Officers' First Amendment Rights*

According to Weinstein, his suspension from the police force was in furtherance of a longstanding "custom or practice" of retaliation against those officers who supported the FOP. To sustain this claim, a plaintiff must allege facts sufficient to raise an inference that there was "a widespread practice that, 'although not authorized by written law or express municipal policy, [was] so permanent and well settled as to constitute a custom or usage with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir.1991); *see also Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001). The "custom or practice" must be so widespread that the City was constructively aware of it, or that the City had actual knowledge of the wrongdoing. *See Denno v. Sch. Bd. of Volusia Cnty., Fla.*, 218 F.3d 1267, 1277 (11th Cir.2000).

Weinstein has sufficiently plead facts to support the claim that the City had a "custom or practice" of retaliation

against officers who supported the FOP. The PBA was heavily entrenched in local politics, so much so that "[t]he endorsement of the PBA was viewed as essential by incumbent officials who were running for City office." First Am. Compl. ¶ 38. McVay led the PBA and rose in rank through the police department by virtue of that position. *Id.* ¶¶ 20–33. The City leaders, including Schwartz, were close political allies of McVay and the PBA. *Id.* ¶ 46.

Weinstein disrupted the status quo by leading the FOP, the group that ousted the PBA from power. *Id.* ¶¶ 56–62. The alleged retaliation occurred after the ouster. *Id.* ¶ 63. Weinstein's work mailbox was defaced, and despite a formal complaint, the City did not investigate the incident. *Id.* ¶¶ 66, 68. McVay allegedly attacked Weinstein after the two discussed work-related issues. *Id.* ¶¶ 70–79. That incident led to disciplinary action against Weinstein, in which Schwartz suspended Weinstein without pay and benefits for 90 days. *Id.* ¶¶ 124–25.

The campaign against Weinstein and the FOP supporters also rose to the highest levels of the City government. *Id.* ¶ 156. It was the city manager, Schwartz, and the chief of police, Pandolfi, who oversaw the disciplinary proceedings that resulted in Weinstein's suspension from the police force. *Id.* ¶¶ 103–128. Additionally, the allegations about the PBA's political connections to City leaders support an inference that the City had at least constructive knowledge of the alleged wrongdoing. Importantly, Weinstein alleges numerous specific instances of pro-FOP officers receiving harsh discipline and demotions. *Id.* ¶¶ 152–66. The allegations also support an inference that acts of retaliation were widespread, with nearly half of the pro-FOP officers being accused of misconduct, only to be later cleared of those accusations by independent investigation. *Id.* ¶ 156.

Weinstein has sufficiently plead a "custom or practice" of retaliation against officers who supported the FOP. Therefore, the City's motion to dismiss Count I based on a failure to plead a "custom or practice" of retaliation is denied.

### 2. *Schwartz was a Final Policymaker with Respect to his Decision to Suspend Weinstein*

 Weinstein's second First Amendment claim against the City is based on the allegation that Schwartz suspended Weinstein for 90 days in retaliation for his advocacy for the FOP. Weinstein argues that the City is liable for the suspension because Schwartz had the power to hire and fire police officers pursuant to the City's charter and was, therefore, a final policymaker. *Id.* ¶¶ 169–72; Plaintiff's Response to the City's Motion to Dismiss, at 5–6. However, the City argues that Schwartz was not a final policymaker because, pursuant to the CBA, his decision to suspend Weinstein was reviewable by an arbitrator. *See* First Am. Compl. ¶¶ 131, 134; City's Mot. to Dismiss, at 8–9. For the reasons discussed below, the Court concludes that Schwartz was a final policymaker.

 "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion). Those appropriate circumstances exist when "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481, 106 S.Ct.

1292. A government official does not have final policymaking authority when his decision is subject to administrative review. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion); *see also Morro v. City of Birmingham,* 117 F.3d 508, 514 (11th Cir.1997); *Scala v. City of Winter Park,* 116 F.3d 1396, 1403 (11th Cir.1997); *Hill v. Clifton,* 74 F.3d 1150, 1152 (11th Cir.1996). Furthermore, "whether an official had final policymaking authority is a question of state law." *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292.

■■■■ The City argues that Schwartz was not a final policymaker with regard to his decision to suspend Weinstein because his decision was reviewable in arbitration pursuant to the CBA. City's Mot. to Dismiss at 7 (citing *Quinn v. Monroe County,* 330 F.3d 1320 (11th Cir.2003)). The Eleventh Circuit has recently rejected this exact argument. "An independent arbitrator, who is not otherwise an employee of the city, is not vested with final policymaking authority for the city." *Carter v. City of Melbourne,* 731 F.3d 1161, 1167 (11th Cir.2013). " '[T]hat someone outside of the municipal government may reverse the official's decision does not mean that the official does not speak for the municipality when he or she initially makes that decision.' " *Id.* Therefore, Schwartz's decision to suspend Weinstein was "final for the purposes of municipal liability." *Id.*

Therefore, the City's motion to dismiss Count I fails because there are sufficient allegations in the First Amended Complaint to raise an inference of a "custom or practice" of retaliation against Weinstein. The City's motion is also denied with respect to Count II because Schwartz was a final policymaker for purposes of the suspension decision.

### C. *Schwartz's Motion to Dismiss (Count III)*

Weinstein also brings a claim against Schwartz for violation of his First Amendment rights (Count III), claiming that Schwartz suspended him in retaliation for his FOP activity. Schwartz argues that he could not be liable because he was not a final decisionmaker. Schwartz also contends that he is entitled to quasi-judicial immunity and qualified immunity. These arguments are discussed below.

#### 1. *Schwartz's Argument that He Did Not Make a Final Decision is Misplaced*

■■■■ Schwartz argues that his decision to suspend Weinstein could not have deprived Weinstein of a constitutional right because it was not "final," citing *Scala,* 116 F.3d at 1401. Schwartz Mot. to Dismiss at 9. However, *Scala* concerned municipality liability, not individual defendants. 116 F.3d at 1397. To establish individual liability against Schwartz, Weinstein must only allege facts that demonstrate that Schwartz made a decision (not necessarily the final decision) that violated Weinstein's rights. *See Quinn,* 330 F.3d at 1326. Weinstein meets this requirement by alleging that Schwartz was the person who decided to suspend Weinstein. (First Am. Compl. ¶ 125.) Accordingly, Schwartz's motion to dismiss on this ground fails.

#### 2. *Quasi–Judicial Immunity Does Not Apply*

■■■ Schwartz argues that he is entitled to quasi-judicial immunity for his suspension of Weinstein. The doctrine of quasi-judicial immunity arises out of the doctrine of judicial immunity, which prevents judges from being held liable for carrying out their duties. *See, e.g., Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The rationale is

that judges should not have to fear that "unsatisfied litigants [will] hound [them] with litigation." *Id.* at 554, 87 S.Ct. 1213.

■ Over time, the doctrine has been expanded to include other acts similar to adjudicatory functions, such as those performed by administrative law judges, prosecutors, witnesses in judicial proceedings, and grand jurors. *See Cleavinger v. Saxner,* 474 U.S. 193, 200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985). Courts consider several factors to determine whether a particular action is sufficiently related to the judicial process to warrant quasi-judicial immunity. *See Jones v. Cannon,* 174 F.3d 1271, 1282 (11th Cir.1999). Considerations pertinent to this inquiry are:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger,* 474 U.S. at 202, 106 S.Ct. 496.

■ Schwartz argues that he acted in a quasi-judicial capacity pursuant to the CBA in presiding over a hearing before he made the decision to suspend Weinstein, and should be afforded quasi-judicial immunity. Schwartz Mot. at 7. However, Schwartz bears the burden of demonstrating that immunity applies, *see Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and cannot carry that burden here. Because the allegations in the First Amended Complaint do not discuss the specific nature of the hearing and what procedural safeguards were guaranteed, it is impossible, at this stage, for Schwartz to show that the *Cleavinger* factors apply. Thus, Schwartz will not be

granted quasi-judicial immunity at this stage.

### 3. *Qualified Immunity Does Not Apply*

■ Schwartz further argues he is entitled to that qualified immunity. "Under the doctrine of qualified immunity, government officials acting within their discretionary authority are immune from suit unless the official's conduct 'violates clearly established federal statutory or constitutional rights of which a reasonable person would have known.'" *Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir.2010). "Once [a government official] establishes that he was acting within the scope of his discretionary authority, 'the burden shifts to the plaintiff to show that qualified immunity is not appropriate.'" *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002). This requires the court to "determine 'whether the plaintiff's allegations, if true, establish a constitutional violation." *Keating,* 598 F.3d at 762. Next, the Court must determine whether the constitutional violation was clearly established. *Id.* "If the plaintiff satisfies both parts of the test, then the [official] is not entitled to qualified immunity." *Id.*

#### a. *Schwartz Acted Within His Discretionary Authority*

■ For a government official to have acted within his discretionary authority, he must have been "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir.2004). The requirement is satisfied here because Schwartz allegedly suspended Weinstein pursuant to his power as the City Manager. *See* First Am. Compl. ¶ 13.

### b. Weinstein's Allegations, taken as true, establish a Constitutional Violation

According to Weinstein, Schwartz suspended him because of his advocacy for the FOP, in violation of his rights to freedom of speech and association. Schwartz argues that he is entitled to qualified immunity because Weinstein cannot establish that Schwartz spoke as a *citizen* on a matter of *public concern.*

 A public employee's speech is protected under the First Amendment where it meets two requirements: the employee must have spoken both as a private citizen and on a matter of public concern. *Garcetti v. Ceballos,* 547 U.S. 410, 416, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). The First Amendment also protects public employees' right to associate freely when they act as citizens. *See D'Angelo v. Sch. Bd. of Polk Cnty., Fla.,* 497 F.3d 1203, 1212–13 (11th Cir.2007). A freedom of association claim does not require that the associational activity relate to a matter of public concern. *See id.* Thus, the first question for both the freedom of speech and freedom of association claims is whether Weinstein was acting as a citizen or as an employee when he spoke and associated.

 An employee does not act as a *citizen* when speech is made pursuant to his job duties. *See Garcetti,* 547 U.S. at 423, 126 S.Ct. 1951. Schwartz argues that promoting "[t]he efficiency and effectiveness of the police function is part of [Weinstein's] job." However, the First Amended Complaint does not directly substantiate Schwartz's characterization of Weinstein's job duties, and at this stage we are bound to construe the allegations in the complaint in the light most favorable to the plaintiff.

 Schwartz also argues that Weinstein's speech was not made as a citizen because "whatever information [Weinstein] had to form the basis for his opinions regarding the effectiveness of the department, or morale in the department, was acquired as a direct result of the performance of his duties as a police officer." However, the relevant inquiry is whether his speech was in furtherance of Weinstein's official job duties—not how Weinstein obtained the information. Indeed, in *Garcetti* the Court explained that "[t]he First Amendment protects some expressions related to the speaker's job." *Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951. The Court provided the example of teachers, who " 'as a class, [are] the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent.' " *Id.* Similarly, police officers would be in the best position to have informed opinions about the police union and whether cronyism is adversely affecting the police department.

 Schwartz's argument that Weinstein was not speaking as a citizen because the issues he spoke about were work-related fails for the same reason—the focus of the inquiry is whether Schwartz was speaking pursuant to his official job duties, not whether he was speaking about issues that may affect his employment. *See id.* at 421–23, 126 S.Ct. 1951. Accordingly, the First Amended Complaint establishes that Weinstein spoke and associated as a citizen.

 As discussed above, to sustain a freedom of speech claim, the complaint must also allege that Weinstein's speech dealt with a matter of public concern. *See Garcetti,* 547 U.S. at 417, 126 S.Ct. 1951. "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or

when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps,* —— U.S. ——, 131 S.Ct. 1207, 1216, 179 L.Ed.2d 172 (2011). The factual inquiries that come into play are whether "the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was." *Vila v. Padron,* 484 F.3d 1334, 1340 (11th Cir.2007).

▮ Weinstein alleges he campaigned to make the FOP the official union of the police force by opposing police officer furloughs and unnecessary and undeserved promotions. First Am. Compl. ¶ 60. Weinstein further alleges he criticized the political relationship between the PBA and the City, telling others that it was "bad for the citizens of [the City] because the rampant cronyism within the department had led to bad police policy and wasteful spending of limited tax dollars." *Id.* ¶ 53. These issues are likely of interest to the community. *See Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1158 (11th Cir.2002) (recognizing that speech concerning mismanagement of a police force might be a matter of public concern). This is especially true considering the prominent role that the PBA allegedly played in local politics. First Am. Compl. ¶¶ 34–46.

Schwartz argues that the speech did not relate to a matter of public concern because Weinstein was acting for his own personal motives, not for the good of the public. Undoubtedly, in some circumstances, the speaker's personal motivation in speaking may preclude a finding that he spoke on a matter of public concern. *See Boyce v. Andrew,* 510 F.3d 1333, 1345 (11th Cir.2007) (per curiam) (finding that public employees who complained about their workloads were speaking about personal grievances unrelated to matters of public concern despite employees couching their complaints in terms of possible danger to children).

▮ But often, as is the case here, a public employee's speech may serve dual objectives, both personal and public. Indeed, "the fact that [an officer] would be affected by the policy changes for which he was advocating cannot be cause alone to deny him First Amendment protections." *Carter,* 731 F.3d at 1169. For example, in *Cook v. Gwinnett County School District,* 414 F.3d 1313, 1316–17 (11th Cir.2005), a school bus driver was president of a union-like organization. *Id.* The organization sought "to improve the safety of children and believe[d] that well-trained employees are one of the keys to school safety." *Id.* at 1319. In her capacity as president of the organization, the plaintiff spoke to her fellow employees and supervisors about both child safety and improving a variety of conditions for herself and the other drivers. *Id.* The school district eventually transferred the plaintiff to a less desirable position, which she claimed was in retaliation for her organizational activities. *Id.* at 1316–17. The court found her speech satisfied the public concern requirement. *Id.* at 1319. The court also expressly found that the fact that the speech was made to coworkers, rather than to the public at large, did not remove it from the category of public concern. *Id.*

The First Amended Complaint alleges speech made for both private and public concerns. Like the employee's speech in *Cook,* Weinstein's speech involved recruiting fellow employees to join a work-related organization. First Am. Compl. ¶¶ 56–62; *Cook,* 414 F.3d at 1316–17. In both cases, the speech was made exclusively to coworkers and concerned both issues of public safety and of improving working conditions for the speaker and fellow employees.

*See id.; Cook,* 414 F.3d at 1317, 1319; *Carter,* 731 F.3d at 1169–70.[3]

Accordingly, the allegations are sufficient to establish that Weinstein spoke and associated as a citizen, and spoke on a matter of public concern, as required for his freedom of speech and association claims.

### c. The Alleged Constitutional Violations Were Clearly Established

For Weinstein to avoid qualified immunity, he must allege that Schwartz violated a clearly established law. *See Keating,* 598 F.3d at 762. That requirement is met here. Qualified immunity was also at issue in *Cook,* which, as discussed above, concerned facts strikingly similar to those here. 414 F.3d at 1316–19. After determining that the speech and association in that case satisfied the public concern requirement, the court determined that the law was clearly established for both claims. *Id.* at 1318, 1320. Since *Cook* involved remarkably similar facts and was decided prior to the conduct at issue here, the law was even more clearly established at the time of the alleged violations than when *Cook* was decided. Accordingly, Schwartz is not entitled to qualified immunity.

Therefore, Weinstein's claim against Schwartz (Count III) survives the motion to dismiss. Weinstein's allegations demonstrate that Schwartz was a decisionmaker, and neither quasi-judicial immunity nor qualified immunity applies.

### D. McVay and Cruz's Motions to Dismiss (Counts IV, VI, VII)

Weinstein alleges McVay and Cruz conspired to conceal the true nature of the attack in violation of Weinstein's First Amendment rights (Count IV). Weinstein also brings a claim against McVay for use of excessive force in violation of the Fourth Amendment (Count VI), based on the attack. Weinstein further claims that Cruz violated his Fourth Amendment rights by failing to intervene and stop excessive force when McVay allegedly attacked Cruz (Count VII). Weinstein also brings a state law battery claim against McVay (Count VIII).

McVay and Cruz move to dismiss the conspiracy claim (Count IV) for failure to comply with Rule 8, which requires a "short and plain statement of the claim showing the pleader is entitled to relief." Additionally, McVay and Cruz argue that Counts IV, VI, and VII should be dismissed on qualified immunity grounds. These arguments are discussed below.

#### 1. Weinstein has Complied with Rule 8(a)(2)

McVay and Cruz argue that Count IV—the First Amendment conspiracy claim—should be dismissed because the First Amended Complaint is a "shotgun pleading" that violates Rule 8(a)(2). "A complaint that fails to articulate claims with sufficient clarity to allow the defendant to frame a responsive pleading constitutes a 'shotgun pleading.'" *Lampkin–Asam v. Volusia Cnty. Sch. Bd.,* 261 Fed. Appx. 274, 277 (11th Cir.2008). Shotgun pleadings are those which are confusing, incoherent, or repetitive. *See id.* A review of the First Amended Complaint demonstrates that it is not a "shotgun pleading." The allegations are set out in an organized fashion, and it is clear which allegations relate to the various causes of

---

**3.** Schwartz argues that *Cook* is not persuasive because it was decided before *Garcetti,* where the Court found that employees must speak and associate as *citizens* to receive First Amendment protection. But, as discussed above, the citizen requirement is satisfied here, and *Cook* is relevant to the public concern inquiry.

action. Therefore, McVay and Cruz's arguments on this point fail.

### 2. *Qualified Immunity Applies to Counts IV, VI, and VII*

McVay and Cruz further argue that they are entitled to qualified immunity for all of their claims. Because Weinstein already conceded at the hearing on August 8, 2013, that McVay and Cruz acted within their discretionary authorities, the Court must only consider whether the allegations establish violation of a clearly established constitutional right.

▮▮▮ Weinstein's First Amendment conspiracy and Fourth Amendment claims are brought under § 1983 and require McVay and Cruz to have acted under "color of state law." *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995). To determine whether a state employee acted under "color of state law," courts must ask whether he "was acting pursuant to the power [he] possessed by state authority or acting only as a private individual." *Id.* "[A] defendant in a § 1983 suit acts under color of law when he abuses the position given to him by the State." *Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1303 (11th Cir.2001).

Regarding the First Amendment claim based upon McVay and Cruz's conspiracy to conceal the true nature of the fight (Count IV), McVay and Cruz argue they were not acting under "color of state law." Weinstein did not address this issue in his briefs but carries the burden to demonstrate that there was a constitutional violation. *See Taylor v. Alvarez*, No. 07–civ–23003, 2008 WL 1840719, at *2 (S.D.Fla. Apr. 21, 2008); *Double AA Int'l Inv. Grp., Inc. v. Swire Pac. Holdings, Inc.*, 674

F.Supp.2d 1344, 1359 n. 5 (S.D.Fla.2009) (explaining failure to address an argument in a Response is a concession to the argument).[4] Therefore, McVay and Cruz are entitled to qualified immunity on Count IV.

▮▮▮ McVay and Cruz also argue that the Fourth Amendment claims (Counts VI and VII) are barred by qualified immunity because McVay was not acting under "color of state law" when he allegedly attacked Weinstein. Weinstein points to several cases in finding that police officers or public officials used their positions of power to effectuate crimes, and thus acted under color of state law. *See United States v. Tarpley*, 945 F.2d 806, 808 (5th Cir.1991); *Griffin*, 261 F.3d at 1299–1316. However, not every action performed while in uniform is necessarily committed under color of state law. For example, in *Butler v. Sheriff of Palm Beach County*, 685 F.3d 1261, 1268 (11th Cir.2012), the court found that a court officer did not act under color of state law when she attacked her daughter's lover, even though she was in uniform at the time and held the young man by using her officially issued firearm and handcuffs. The court reasoned that the officer did not use her position of authority to facilitate the attack—rather, the officer merely happened to be in uniform because she just returned from her shift, and any private citizen could own a firearm and handcuffs. *Id.* at 1268; *see also Almand v. DeKalb Cnty., Ga.*, 103 F.3d 1510, 1515 (11th Cir.1997). Thus, the pertinent question is the extent to which a government official uses his official power to effectuate unconstitutional conduct.

▮▮▮ Weinstein points to McVay's threats after the attack that "This is going to stay here. . . . I'm a Lieutenant. You're

---

**4.** McVay and Cruz further argue that this claim fails because it is barred by the intracorporate conspiracy doctrine, but the Court

need not address that argument because the claims are barred by qualified immunity.

going to lose." Weinstein argues that "McVay's message was clear: because of McVay's rank as a high level officer within the police department, McVay had power over Weinstein and he was prepared to use it." Opp'n to Cruz Mot. at 12. This analysis misses the mark. These allegations simply demonstrate that McVay used his authority to dissuade Weinstein from reporting the fight after the fact. But the fight itself is the alleged unconstitutional conduct. McVay's attempt to cover up the fight is irrelevant for purposes of this analysis.

Based on the allegations, McVay did not act under "color of state law" when he attacked Weinstein. McVay did not effectuate the attack by using a clear show of police authority. *See Tarpley,* 945 F.2d at 809. McVay happened to be at work, but he was not using his official authority or status when he attacked Weinstein. McVay was in the police trailer by virtue of his status as a police officer, but there is nothing to suggest he commenced the attack by virtue of that status. Rather, it is readily apparent that the attack was the result of personal animus. In sum, this is a situation where "the assault ... was committed completely away from and outside the ambit of [McVay's] official duties or obligation[s]." *Griffin,* 261 F.3d at 1307. Because McVay was not acting under "color of state law" when allegedly attacking Weinstein, Weinstein cannot state a claim for excessive force against McVay or failure to stop excessive force against Cruz, much less violation of a clearly established right. Thus, qualified immunity applies to the Fourth Amendment claims against McVay and Cruz.

3. *The Court Will Not Exercise Supplemental Jurisdiction over the Battery Claim (Count VIII)*

The Court will decline to exercise supplemental jurisdiction over the state law battery claim (Count VIII) if all of the claims against McVay in which the Court has original jurisdiction are dismissed ultimately with prejudice. *See* 28 U.S.C. § 1367(c)(3); *Samedi v. Miami–Dade Cnty.,* 206 F.Supp.2d 1213, 1223 (S.D.Fla. 2002) (declining to exercise jurisdiction over state law claims after dismissing all other claims against municipal defendant).

## III. CONCLUSION

Consistent with the foregoing analysis, the Court hereby

DENIES the City's motion to dismiss [D.E. No. 27]. The Court further DENIES Schwartz's motion to dismiss [D.E. No. 30] and GRANTS McVay and Cruz's motions to dismiss with leave to amend. [D.E. Nos. 19, 44]. If Weinstein elects to amend his First Amended Complaint, he shall do so by October 10, 2013. If all of the claims against McVay are ultimately dismissed with prejudice, the Court will also dismiss Count VIII without prejudice.