[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11941

_____

D.C. Docket No. 2:16-cv-00650-JEO

AUBREY WILLIAMS

Plaintiff-Appellee,

versus

DANIEL AGUIRRE,
RICHARD HALUSKA

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(July 13, 2020)

Before WILLIAM PRYOR, Chief Judge, GRANT, Circuit Judge, and ANTOON,* District Judge.

WILLIAM PRYOR, Chief Judge:

_____

* Honorable John Antoon II, United States District Judge for the Middle District of Florida, sitting by designation.

This interlocutory appeal requires us to decide whether Officers Daniel Aguirre and Richard Haluska are entitled to summary judgment based on immunity from Aubrey Williams's complaint of malicious prosecution. After being shot by Aguirre and spending two months in a hospital recovering from his injury, Williams spent more than 16 months in pretrial detention on charges of attempted murder based on the officers' accusations that he pointed a gun at each of them during an investigatory stop. Eventually, a news organization published a video recorded on a dashboard camera that supported Williams's account that he had dropped his gun and complied with the officers' commands. The district attorney later dismissed the charges against Williams, who then sued the officers and alleged that they fabricated the accusations against him to excuse their use of force. His complaint presented claims of malicious prosecution under both the Fourth Amendment and Alabama law. Aguirre and Haluska moved for summary judgment based on qualified immunity and state-agent immunity. They contended that they did not violate any of Williams's clearly established constitutional rights because they had probable cause to arrest him for carrying a concealed firearm without a permit and at least arguable probable cause to arrest him for attempted murder. They also argued that they did not cause Williams's extended pretrial detention. The district court denied the officers' motion for summary judgment. Because, under Williams's version of events, the officers enjoy no immunity from

Williams's complaint that they falsely accused him of attempted murder, we affirm.

## I. BACKGROUND

We divide our background discussion in three parts. We first describe the events that led to the arrest based on the evidence viewed in the light most favorable to Williams. Next, we explain the officers' actions following the investigatory stop and the details of Williams's criminal prosecution. We then conclude with the procedural history of this suit.

### A. Factual Background.

In the still-dark hours of a morning in April 2014, Williams and Devon Brown awakened after an evening playing video games and decided to purchase snacks at a nearby gas station. Both Williams and Brown carried concealed handguns "for protection," though Williams lacked a permit to carry a concealed firearm. As Williams and Brown purchased their snacks, Officers Aguirre and Haluska of the Birmingham Police Department arrived at the gas station to investigate a reported robbery at a nearby bank. When questioning someone outside the gas station, the officers saw Williams and Brown looking at them. Williams moved his gun from his hip and placed it in the plastic grocery bag he received for his snacks to conceal it from the officers. He and Brown then left the

gas station and walked into a nearby alley to avoid "get[ting] messed with by the police officers."

Williams and Brown did not get far. The officers followed them in a squad car and ordered them to lie on the ground. When Williams and Brown failed to comply with that order, the officers approached them. Although Brown denied having a weapon, Haluska saw a handgun in a pocket of his pants. The two scuffled after Haluska tried to grab Brown's arm. Aguirre then tasered Brown, who fell to the ground, and Haluska then began handcuffing him.

Aguirre dropped his taser, drew his pistol, and again ordered Williams to lie on the ground. Williams complied by placing his hands and knees on the ground as he faced down. Williams also tried to tell Aguirre that he had a weapon, but Aguirre did not appear to hear him. As Williams lowered himself to the ground, he dropped the bag, which caused his gun to slide out of the bag and underneath him. After Williams got on his hands and knees, Aguirre approached him. Williams turned on his side to tell Aguirre that his gun was underneath him. But as Williams was turning, Aguirre jumped back, fired his gun twice, and shot Williams. Aguirre then kicked Williams's gun away and handcuffed him.

Some of these events were captured on the dashboard camera in the squad car, which Aguirre activated after securing Williams. Because the camera uses a

buffer system that preserves footage from approximately 60 seconds before an officer activates it, it captured the final moments leading to the shooting.

Nothing we viewed in that video conflicts with Williams's account. The recording begins with Williams on his hands and knees on the ground. A plastic bag rests on the ground near his torso. Haluska wrestles with Brown several feet to the left of Williams and Aguirre. Aguirre walks toward Williams with a gun in his hand. When Aguirre reaches Williams, he places his hand on Williams's back. Williams then turns the left side of his torso to face Aguirre. As Williams turns, Aguirre jumps back and shoots him twice. Aguirre then kicks Williams's gun away, rolls Williams over, and handcuffs him. Haluska gestures toward the patrol car, and Aguirre runs to the car to activate the dash camera.

A few minutes after the shooting, other officers and an ambulance arrived on the scene. Haluska arrested Brown. The ambulance took Williams to the hospital, where he remained for two months recovering from the shooting.

### B. The Prosecution of Williams.

In the hours and days after the shooting, the officers provided a series of statements that presented a dramatically different narrative of the encounter from the one Williams offered. They asserted that Williams had pointed his gun at each of them, which led Aguirre to shoot Williams. These statements eventually led to criminal charges against Williams for attempted murder.

The officers gave three statements on the day of the incident. In an interview with Birmingham Police Detective Rodney Rogers, Haluska stated that Williams "backed up and pointed a pistol" at him after Aguirre had tasered Brown. Haluska stated, Aguirre "yell[ed] hey" to Williams, which led Williams to "turn[] and point[] the pistol" at Aguirre. Aguirre then "pulled his pistol and . . . shot twice." Haluska also submitted an arrest report that morning that offered the same narrative. The report stated that after Aguirre tasered Brown, "Williams . . . pulled a pistol and pointed [it] at Officer Haluska. Officer Aguirre yelled at Williams and Williams then pointed [the] weapon at Officer Aguirre. Officer Aguirre shot Williams and was able to get the weapon away from him." The report listed the charges of attempted murder and carrying a concealed firearm without a permit. And Officer Michael Burchfield, who arrived on the scene after the shooting, submitted two identical incident reports based on statements from both Aguirre and Haluska. Burchfield's report stated that Williams pointed a gun at both officers, that Aguirre shot Williams, and that Williams then "fell to the ground."

The officers' narrative evolved after they saw the video from the dashboard camera, which showed that Williams was on his hands and knees when Aguirre shot him and that Williams could not have pointed the gun at both of them immediately before the shooting. Their statements on the day of the shooting, which occurred before the officers saw the video, asserted that Williams pointed

the gun at each of them once, likely when he was standing, which led Aguirre to shoot him. But their later accounts shifted in ways that brought their narrative closer to the video.

Haluska's next statement came four days later in an interview with Sergeant Rodney Powrzanas of the internal affairs division of the police department. Haluska told Sergeant Powrzanas that Williams had pointed the gun at each officer before the recording started and that the video showed Williams pointing the gun at Aguirre for a second time. Specifically, Haluska stated that Williams first pointed the gun at him, which led Aguirre to yell "drop the weapon." Williams pointed his gun at Aguirre but then "went down onto his knees like he was going to comply," which was the point at which the video began recording. As Aguirre approached Williams to detain him, Williams "turned back to his left side and pointed the weapon at Officer Aguirre from the kneeling position, and [O]fficer Aguirre then fired two shots as he jumped back to get to safety."

Aguirre, in contrast, told Sergeant Powrzanas that Williams had pointed the gun at each officer once immediately before the shooting:

> [Williams] had a bag in his left hand, a plastic bag in his left hand. He sat the bag down and then came up with a black firearm pistol and pointed it at my partner Officer Haluska at which point I yelled several times drop the weapon, drop the weapon and started pushing him . . . . [Williams] then pointed the weapon away from Officer Haluska and pointed it at me, and fearing for both of our safety and our lives, I jumped back and engaged by pulling my city approved weapon, discharging it twice, hitting [Williams] both times . . . .

Later in the interview, Aguirre added that he "pushed" Williams while yelling "drop the weapon." And although he said earlier that Williams "came up with" the pistol after setting the bag down, Aguirre clarified that Williams was on the ground when he shot him.

Six days after the shooting, each officer filed a written statement. Aguirre repeated the account he gave to Powrzanas:

> [Williams] put a plastic bag on the ground with his left hand and came up with a black pistol in his right hand. [Williams] pointed the weapon at Officer Haluska. Fearing for the safety of Officer Haluska, I yelled "Drop the weapon" several times and started to push [Williams]. [Williams] then pointed the weapon at me at which time I stepped back, drew my weapon, and engaged [Williams] by firing two times . . . .

Haluska, in turn, offered a different account that suggested Williams was on his knees for the entire exchange in which he pointed a gun at the officers:

> I looked up and saw [Williams] pointing a pistol at me. Officer Aguirre yelled "Drop the weapon". [Williams] was on his knees and still had a pistol in his right hand. Officer Aguirre was walking up to place [Williams] in handcuffs when [Williams] pointed the pistol at Officer Aguirre. Officer Aguirre jumped back and fired two rounds with his firearm . . . .

Based on the officers' statements from the day of the shooting and the video from the dashboard camera, Rogers filed probable-cause affidavits to obtain a warrant for Williams's arrest. The affidavits contained only one factual statement: that Williams "present[ed] a firearm and point[ed] it at" both Aguirre and Haluska.

A judge issued a warrant for Williams's arrest on two charges of attempted murder.

Williams was released from the hospital and committed to jail in June 2014. A grand jury indicted him a month later on two charges of attempted murder. The trial court set Williams's bail at $250,000. Unable to make bail, Williams remained in jail for the next 16 months. In October 2015, the trial court reduced his bail to $50,000. Williams posted bail the next month.

After Williams's release, a local news organization obtained the dashcam video and published it. Afterward, the Birmingham Police Department suspended an award that it had given to Aguirre for his actions during the encounter. Nearly a year later, the Jefferson County District Attorney moved to dismiss the charges. Although the district attorney did not explain his reasoning in the motion, his office issued a press release that conceded it was "unable to meet the burden of proof beyond a reasonable doubt." The trial court granted the motion, which ended the criminal prosecution against Williams.

### C. Procedural History.

Williams filed a complaint in the district court that accused Aguirre and Haluska of "deliberate fabrication of evidence and submission of false reports." He alleged that the officers lied when they said he pointed a gun at them and that their lies caused him to suffer more than 16 months of pretrial detention. He asserted

claims of malicious prosecution against both officers under the Fourth Amendment and Alabama law.

The officers moved for summary judgment based on qualified immunity and state-agent immunity. They asked the district court to discredit Williams's narrative of events because, they contended, the video from the dashboard camera proved that he was holding a gun when Aguirre shot him. They also argued that their probable cause to arrest Williams for carrying a concealed firearm without a permit entitled them to qualified immunity, that they had arguable probable cause to arrest Williams for attempted murder even under Williams's version of events, and that they did not cause Williams's injury because the involvement of the district attorney and grand jury severed the causal chain. For state-agent immunity, the officers reiterated that they had arguable probable cause to arrest Williams for attempted murder and that Williams could not prove that they acted with malice.

The district court denied the officers' motion. It ruled that the video footage did not clearly resolve whether Williams was holding a gun, that probable cause for an uncharged crime could not defeat Williams's federal claim, that the officers lacked arguable probable cause for attempted murder under Williams's version of events, and that the officers' alleged fabrication preserved the causal chain between their actions and Williams's seizure. It also concluded that Williams had provided evidence of malice sufficient to preserve his claim of malicious

prosecution under Alabama law. The district court denied qualified immunity, state-agent immunity, and the officers' motion.

## II. JURISDICTION AND STANDARD OF REVIEW

Although we ordinarily have no jurisdiction to review the denial of a motion for summary judgment, we can review denials of qualified immunity and state-agent immunity under the collateral-order doctrine. *See Hunter v. City of Leeds*, 941 F.3d 1265, 1271 n.2 (11th Cir. 2019). "We review the denial of summary judgment based on qualified immunity *de novo*, viewing the facts in the light most favorable to the nonmovant." *Id.* at 1274 n.8. "The propriety of summary judgment on state-agent immunity grounds is also a question of law to be reviewed *de novo*." *Tinker v. Beasley*, 429 F.3d 1324, 1329 (11th Cir. 2005). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making this determination, we 'view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant.'" *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)).

## III. DISCUSSION

The officers argue that they are immune from Williams's claims of malicious prosecution. They contend that they are entitled to qualified immunity from his claim under the Fourth Amendment and to state-agent immunity from his claim under Alabama law. We address these defenses in turn, and we conclude that the officers have no right to either immunity at this stage of the litigation.

### A. *The Officers Are Not Entitled to Qualified Immunity.*

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (internal quotation marks omitted). To receive qualified immunity, the officer "bears the initial burden to prove that he acted within his discretionary authority." *Dukes v. Deaton*, 852 F.3d 1035, 1041 (11th Cir. 2017). Officers that act within their discretionary authority are "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Williams does not dispute that the officers acted within their discretionary authority, so he bears the burden of proving that they are not entitled to qualified immunity.

Williams argues that Aguirre and Haluska violated his clearly established right under the Fourth Amendment to be free from an unreasonable seizure as a result of a malicious prosecution. 42 U.S.C. § 1983; *Whiting v. Traylor*, 85 F.3d 581, 583–84 (11th Cir. 1996). For this claim, he must prove both "a violation of [his] Fourth Amendment right to be free of unreasonable seizures" and "the elements of the common law tort of malicious prosecution." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (internal quotation marks omitted). Under the common-law elements of malicious prosecution, Williams must prove that the officers "instituted or continued" a criminal prosecution against him, "with malice and without probable cause," that terminated in his favor, and caused damage to him. *Id.* (internal quotation marks omitted). These elements "ultimately are controlled by federal law." *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010) (quoting *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003)).

Because "[c]ommon-law principles are meant to guide rather than to control the definition of § 1983 claims," we must define the elements of this claim in the light of the constitutional provision at issue. *Manuel v. City of Joliet*, 137 S. Ct. 911, 921 (2017); *see also id.* (explaining that common-law principles serve "more as a source of inspired examples than of prefabricated components" (internal quotation marks omitted)). We cannot elevate the common law over the Constitution. Section 1983 is "a method for vindicating federal rights elsewhere

conferred," *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979), not "a federalized amalgamation of pre-existing common-law claims," *Rehberg v. Paulk*, 566 U.S. 356, 366 (2012). And so this Court uses "malicious prosecution" as only "a shorthand way of describing" certain claims of unlawful seizure under the Fourth Amendment. *Whiting*, 85 F.3d at 584; *see also Manuel*, 137 S. Ct. at 919 (holding that a challenge to "pretrial detention unsupported by probable cause . . . lies in the Fourth Amendment").

The officers contend that the district court erred in two ways. First, they contend that Williams failed to satisfy his burden to prove the absence of probable cause for his pretrial detention. Second, they contend that Williams failed to prove that they caused his extended pretrial detention. We reject these arguments in turn and explain that the record presents a genuine dispute about whether the officers violated Williams's clearly established rights.

### 1. The Record Presents a Genuine Dispute of Fact About Whether Williams's Pretrial Detention Was Unlawful.

The officers argue that Williams failed to satisfy his burden to establish a genuine dispute of fact as to whether he was seized in violation of the Fourth Amendment. They contend that they had probable cause to charge Williams with carrying a concealed firearm without a permit, Ala. Code §§ 13A-11-73(a), -11-84(a), and alternatively at least arguable probable cause to arrest him for attempted murder, *id.* §§ 13A-4-2, -6-2. In support of that alternative argument, the officers

contend that because Williams admitted his gun was on the ground within reach when Aguirre shot him, a reasonable officer could have seen it and inferred that Williams had drawn his gun to shoot them.

Although the officers' arguments would have force in the context of a false-arrest claim, Williams's claim of malicious prosecution involves a different kind of seizure. A claim of false arrest or imprisonment under the Fourth Amendment concerns seizures without legal process, such as warrantless arrests. *Wallace v. Kato*, 549 U.S. 384, 388–89 (2007). These claims accrue when either the seizure ends or the plaintiff is held pursuant to legal process. *Id.* Malicious prosecution, in contrast, requires a seizure "pursuant to legal process." *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016) (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)). *But see Whiting*, 85 F.3d at 585–86 & n.7 (holding that for the purposes of determining accrual, malicious prosecution is the common-law analogue to seizures without process that occur after the start of criminal proceedings), *abrogated by Wallace*, 549 U.S. at 389–90 (holding that Fourth Amendment challenges to seizures without process adopt the rule of accrual for the tort of false imprisonment). Of course, warrant-based seizures fall within this category. *See, e.g.*, *Black*, 811 F.3d at 1267. So do seizures following an arraignment, indictment, or probable-cause hearing. *See Kingsland*, 382 F.3d at 1235; *Kelly v. Curtis*, 21 F.3d 1544, 1553–55 (11th Cir. 1994). A Fourth Amendment violation involving

these seizures occurs "when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Manuel*, 137 S. Ct. at 918. In these situations, "[l]egal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement." *Id.* at 918–19.

Because of this distinction, the relevance of the officers' arguments depends on the extent to which the rules that apply to seizures without process extend to seizures pursuant to legal process. And on that count, each of the officers' arguments raises a threshold question that we must answer before considering whether Williams has offered proof that his detention was unlawful.

The officers' argument that they had probable cause to seize Williams for unlawfully possessing a concealed firearm assumes that claims of malicious prosecution are subject to the any-crime rule, which insulates officers from false-arrest claims so long as probable cause existed to arrest the suspect for *some* crime, even if it was not the crime the officer thought or said had occurred. *See Lee v. Ferraro*, 284 F.3d 1188, 1195–96 (11th Cir. 2002). If the any-crime rule applies, then the officers prevail in the light of Williams's admission that they had probable cause to detain him for carrying a concealed firearm without a permit. But without the any-crime rule, that admission is irrelevant because Williams was detained on charges of attempted murder. Instead, Williams will prevail if he establishes a

genuine dispute about whether at least one of the two charges against him for attempted murder lacked probable cause.

The officers' alternative argument that they had arguable probable cause to seize Williams for attempted murder assumes that probable cause for malicious prosecution, like false arrest, turns on the "facts and circumstances within the [arresting] officer's knowledge." *Id.* at 1195 (internal quotation marks omitted). On that question, some of our recent decisions apply the false-arrest standard to seizures pursuant to legal process, *see, e.g.*, *Wood*, 323 F.3d at 876, 878, 882; *Carter v. City of Melbourne*, 731 F.3d 1161, 1166, 1170 (11th Cir. 2013), but earlier precedents look only to the information before the judicial officer that issued the legal process for the seizure, *see, e.g.*, *Jones v. Cannon*, 174 F.3d 1271, 1285–86 (11th Cir. 1999); *Garmon v. Lumpkin Cty.*, 878 F.2d 1406, 1408–09 (11th Cir. 1989). Because the officers would have known that the gun was on the ground within Williams's reach under his narrative, their argument is material if our false-arrest standard applies. Under that standard, we would have to determine whether the presence of the gun near Williams would have given the officers arguable probable cause to arrest Williams for attempted murder. But the warrant application did not state that Williams's gun was on the ground, so the officers' argument is irrelevant if we examine probable cause from the information before the judicial officer who issued the warrant for Williams's arrest.

Although the absence of probable cause is undoubtedly a requirement for a claim of malicious prosecution, questions about that requirement remain in our caselaw. So we first resolve whether the any-crime rule applies to claims of malicious prosecution. We then consider which body of information is relevant to probable cause in the context of malicious prosecution. Finally, we turn to the facts of this appeal and determine whether Williams has satisfied his burden to establish a genuine dispute about the absence of probable cause.

a.  The Any-Crime Rule Does Not Apply to Malicious Prosecution.

Whether the any-crime rule extends to malicious prosecution is unsettled. Our sister circuits have split on the question. *Compare Howse v. Hodous*, 953 F.3d 402, 409 & n.3 (6th Cir. 2020) (concluding that the any-crime rule applies to most claims of malicious prosecution), *with Johnson v. Knorr*, 477 F.3d 75, 83–84 (3d Cir. 2007) (holding that the any-crime rule does not apply to claims of malicious prosecution), *and Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991) (holding the same); *see also Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682–83 (7th Cir. 2007) (agreeing with *Johnson* and *Posr* when considering a state-law claim of malicious prosecution). And although we have assumed that the any-crime rule applies to malicious prosecution, we did so only under the erroneous premise that a seizure without legal process, which implicates the rule, could sustain a claim of malicious prosecution. *See Manners v. Cannella*, 891 F.3d 959, 966, 968–69, 975

(11th Cir. 2018); *see also Grider*, 618 F.3d at 1256–58 (stating in dicta that the any-crime rule applies to malicious prosecution). As we recently explained, the relationship between the any-crime rule and malicious prosecution is "unresolved in our case law pertaining to § 1983 malicious prosecution claims." *Paez*, 915 F.3d at 1285.

The Supreme Court has articulated a two-step approach to "defining the contours and prerequisites of a § 1983 claim." *Manuel*, 137 S. Ct. at 920. We first examine the common-law principles that governed the most analogous tort to the constitutional violation at issue. *See id.* ("[C]ourts are to look first to the common law of torts."). Although we have at times looked to modern tort law when adjudicating claims of malicious prosecution under section 1983, *see, e.g.*, *Kingsland*, 382 F.3d at 1234 (examining Florida's modern approach to malicious prosecution); *Uboh v. Reno*, 141 F.3d 1000, 1004–05 (11th Cir. 1998) (looking to Georgia's modern approach to the favorable-termination requirement of malicious prosecution), the Supreme Court has clarified that the relevant common-law principles are those that were "well settled at the time of [section 1983's] enactment," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019) (internal quotation marks omitted); *see also Kalina v. Fletcher*, 522 U.S. 118, 123 (1997) (explaining that Congress enacted section 1983 "in the light of common-law principles that were well settled at the time"). After identifying the historical common-law rule

most analogous to the alleged constitutional violation, we must consider whether that rule is compatible with the constitutional provision at issue. *See Manuel*, 137 S. Ct. at 921 (holding that courts should "closely attend" to the Constitution "[i]n applying, selecting among, or adjusting common-law approaches").

Because malicious prosecution is the common-law analogue to the constitutional violation that Williams alleges, *see Uboh*, 141 F.3d at 1003–04, we first examine the probable-cause element of malicious prosecution as it existed when Congress enacted section 1983. We then consider, in the light of the Fourth Amendment, whether we should apply that principle to claims of malicious prosecution under section 1983.

At common law, the probable-cause element of malicious prosecution developed in the shadow of competing interests. The tort descended from an ancient line of remedies for false accusations. *See* Percy Henry Winfield, *The History of Conspiracy and Abuse of Legal Procedure* 118–30 (1921) (tracing the writ of conspiracy to the tort of malicious prosecution); 2 Frederick Pollock & Frederic William Maitland, *The History of English Law Before the Time of Edward I* 537–38 (Cambridge, Univ. Press 1895) (tracing medieval remedies to the writ of conspiracy). Although early remedies punished every accuser whose prosecution failed, *see* Pollock & Maitland, *supra*, at 537–38, the common law later acknowledged the countervailing problem of deterring honest accusers, *see* P.

H. Winfield, *The Law of Tort* 610 (4th ed. 1948); *see also* 3 William Blackstone, *Commentaries* \*126–27 ("[I]t would be a very great discouragement to the public justice of the kingdom, if prosecutors, who had a tolerable ground of suspicion, were liable to be sued at law whenever their indictments miscarried."). To reconcile the "apprehension of scaring off a just accuser and fear of encouraging a false one," Winfield, *The Law of Tort*, *supra*, at 610, the tort of malicious prosecution required a plaintiff to prove not only that an accusation was false but also that the accuser acted without probable cause, *see* 3 Blackstone, *supra*, at \*127 ("[A]ny probable cause for preferring [the indictment] is sufficient to justify the defendant."). Eventually, the absence of probable cause became "emphatically the essential ground" of malicious prosecution. Johnstone v. Sutton (1786) 99 Eng. Rep. 1225, 1243; 1 T.R. 510, 544 (K.B.).

At common law, probable cause was specific to each accusation. English courts refused to allow accusers to raise the existence of probable cause on other charges as a defense to liability. *See* Ellis v. Abrahams (1846) 115 Eng. Rep. 1039, 1041; 8 Q.B. 709, 713–14; Delisser v. Towne (1841) 113 Eng. Rep. 1159, 1163; 1 Q.B. 333, 342; Reed v. Taylor (1812) 128 Eng. Rep. 472, 473; 4 Taunt 616, 617–18 (Ct. Com. Pl.). *But cf. Johnstone*, 99 Eng. Rep. at 1245 (stating in dicta that a plaintiff could not prevail if the false charges "created no additional trouble, vexation, or expense"). American courts adopted this framework and likewise

concluded that accusers could not shield themselves from liability by establishing probable cause for other charges. *See, e.g.*, *Bauer v. Clay*, 8 Kan. 580, 583 (1871); *Barron v. Mason*, 31 Vt. 189, 198 (1858); *Pierce v. Thompson*, 23 Mass. (6 Pick.) 193, 197 (1828); *see also, e.g.*, 2 Simon Greenleaf, *Treatise on the Law of Evidence* § 449, at 400 (Bos., Little, Brown & Co. 10th ed. 1868) ("It is not necessary that the whole proceedings be utterly groundless; for if groundless charges are maliciously and without probable cause coupled with others, which are well founded, they are not on that account the less injurious, and therefore constitute a valid cause of action."); 2 C. G. Addison, *A Treatise on the Law of Torts* § 860, at 77 (H.G. Wood ed., N.Y., James Cockroft & Co. Am. ed. 1876); 1 Francis Hilliard, *The Law of Torts or Private Wrongs* 433 n.(b) (Bos., Little, Brown & Co. 4th ed. 1874). American courts also rejected accusers' attempts to defend themselves with a plaintiff's alleged commission of *uncharged* crimes. *See, e.g.*, *Sutton v. McConnell*, 50 N.W. 414, 414–16 (Wis. 1879); *Hill v. Palm*, 38 Mo. 13, 20 (1866); *Gregory v. Thomas*, 5 Ky. (2 Bibb) 286, 286 (1811); *see also Wheeler v. Nesbitt*, 65 U.S. (24 How.) 544, 549, 551 (1860) (approving a jury instruction that limited probable cause to "the offence described in the complaint and warrant").

As part of a delicate balance between encouraging valid criminal complaints and discouraging false ones, the tort of malicious prosecution required plaintiffs to

prove the absence of probable cause for at least one charge in an indictment. The any-crime rule threatened to destroy that balance by allowing defendants to "escape liability" "by uniting groundless accusations with those for which probable cause might exist." *Boogher v. Bryant*, 86 Mo. 42, 50 (1885). Such a result, common-law courts concluded, would make "almost a mockery" of malicious prosecution. *Id.*

Nothing in the Fourth Amendment counsels against applying the common-law rule to claims of malicious prosecution under section 1983. The charges that support a defendant's pretrial detention—that is, the seizure pursuant to legal process—meaningfully affect the existence and duration of that seizure. For example, the availability and amount of bail, which determine whether a pretrial seizure occurs at all, are often charge-dependent. *See, e.g.*, Ala. R. Crim. P. 7.2(a)(6), (b). The charges a criminal defendant faces can also prolong his pretrial seizure by requiring additional trial preparation. *See United States v. Jeri*, 869 F.3d 1247, 1257 (11th Cir. 2017) (explaining that "the degree of complexity of the case" influences whether a continuance of a trial schedule is warranted (internal quotation marks omitted)). Keep in mind, Williams spent longer in pretrial detention—more than 16 months—than the maximum one-year sentence of imprisonment he could have received if a jury convicted him of the "other" crime—carrying a concealed firearm without a permit, a Class A misdemeanor.

*See* Ala. Code §§ 13A-5-7(a)(1), -11-73(a), -11-84(a). Williams also would not have faced a $250,000 bail for that violation. *See* Ala. R. Crim. P. 7.2(b) (recommending bail of $300 to $6,000 for Class A misdemeanors); *see also Kelly*, 21 F.3d at 1557 (stating that a plaintiff who faced multiple charges can recover actual damages under malicious prosecution if he can "show both that the defendants were responsible for his continued incarceration on [a particular] charge and that, if the [particular] charge had been dismissed earlier, his bail would have been reduced to an amount he could have posted").

To be sure, probable cause for other offenses may be relevant to damages. We have explained that a plaintiff "cannot recover [actual] damages merely by showing that he was incarcerated on one illegitimate charge." *Kelly*, 21 F.3d at 1557. Instead, the plaintiff must also "show that, but for that illegitimate charge, he would have been released" earlier or would not have faced detention. *Id.*; *see also* 2 Addison, *supra* § 860, at 77; *Delisser*, 113 Eng. Rep. at 1163. But a plaintiff's inability to prove actual damages is not determinative of whether he can state a claim for a constitutional violation. *See Slicker v. Jackson*, 215 F.3d 1225, 1231 (11th Cir. 2000) ("We have held unambiguously that a plaintiff whose constitutional rights are violated is entitled to nominal damages even if he suffered no compensable injury."); *Kelly*, 21 F.3d at 1557. So our conclusion remains the

same regardless of whether probable cause for other offenses may affect the existence of actual damages.

We also acknowledge that the any-crime rule undisputedly applies to warrantless arrests under the Fourth Amendment, *see Devenpeck v. Alford*, 543 U.S. 146, 153 (2004), but warrantless arrests offer little guidance on how we should evaluate seizures pursuant to legal process. For a warrantless arrest, "[a]n arrested individual is no more seized when he is arrested on [several] grounds rather than one," so the only question relevant to the objective reasonableness of a seizure is whether probable cause for *some* crime exists. *Hoffman Estates*, 511 F.3d at 682. The any-crime rule is a natural extension of this principle: because the reasonableness of a warrantless arrest does not turn on the nature of the suspected crime, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 153. But this logic does not apply to seizures pursuant to legal process. The particular charges that a criminal defendant faces objectively affect the ensuing pretrial detention. And unlike the standards governing warrantless arrests, whether an arrest pursuant to a warrant is valid can turn on the mental state of the arresting officer. *See, e.g.*, *Kelly*, 21 F.3d at 1554; *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978).

Regardless of its applicability to warrantless arrests, the any-crime rule does not apply to claims of malicious prosecution under the Fourth Amendment. Centuries of common-law doctrine urge a charge-specific approach, and bedrock Fourth Amendment principles support applying that approach in the context of the charges that justified a defendant's seizure. We reject the officers' argument to the contrary.

 b. Malicious Prosecution Requires the Plaintiff to Prove that the Judicial Determination of Probable Cause Underlying His Seizure Was Invalid.

The analysis of whether seizures pursuant to legal process violate the Fourth Amendment is distinct from the analysis of seizures without legal process. Although the lawfulness of a warrantless arrest turns on whether the arresting officer had probable cause, *Lee*, 284 F.3d at 1195–96, the lawfulness of seizures pursuant to legal process turns on the validity of the legal process itself. In the context of arrest warrants, for example, an officer ordinarily does not violate the Fourth Amendment when he executes a facially valid arrest warrant, regardless of whether the facts known to the officer support probable cause. *See, e.g.*, *Whiteley v. Warden*, 401 U.S. 560, 568 (1971); *Simon v. United States*, 644 F.2d 490, 496 (5th Cir. May 1981). Instead, the Supreme Court has instructed courts to examine whether "the judicial officer issuing such a warrant [was] supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley*, 401 U.S. at 564. Under this standard, "an otherwise insufficient

affidavit cannot be rehabilitated [with] information possessed by the [officer] when he sought the warrant but not disclosed to the issuing magistrate." *Id.* at 565 n.8; *see also W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) ("[J]udicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention."). In other words, warrantless arrests concern whether the facts known to the arresting officer establish probable cause, while seizures pursuant to legal process concern whether the judicial officer who approved the seizure had sufficient information to find probable cause.

Notwithstanding the distinction between seizures with and without legal process, our malicious-prosecution caselaw is not always consistent about what information is relevant when determining whether probable cause exists for a seizure pursuant to legal process—even before considering whether probable cause would exist without any allegedly false information. One line of precedent, which includes our earliest decisions, examines whether probable cause existed from "the facts that were before the magistrate" who issued the arrest warrant, *Garmon*, 878 F.2d at 1409; *accord Paez*, 915 F.3d at 1286–87; *Black*, 811 F.3d at 1267; *Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003); *Kelly*, 21 F.3d at 1554, or the judge who made the relevant determination of probable cause after a warrantless seizure, *Jones*, 174 F.3d at 1284–86; *Kelly*, 21 F.3d at 1554. But other decisions

look to "the facts and circumstances within the [arresting] officer's knowledge."

*Wood*, 323 F.3d at 876, 878, 882; *accord Carter*, 731 F.3d at 1166, 1170; *Grider*,

618 F.3d at 1256; *see also Blue v. Lopez*, 901 F.3d 1352, 1359 (11th Cir. 2018)

(stating that a malicious-prosecution claim "measures whether the defendant had

probable cause . . . as of the beginning of the criminal proceeding"); *Lowe v.*

*Aldridge*, 958 F.2d 1565, 1570 (11th Cir. 1992) (stating that courts should "review

the evidence known to [the defendants] with an eye to whether any reasonable

officer would have sought arrest . . . warrants based on that information"). Two

other decisions concluded that a malicious-prosecution claim turned on the

constitutionality of a warrantless arrest that occurred before arraignment or

indictment, and so they applied the false-arrest standard of probable cause.

*Manners*, 891 F.3d at 968–69, 975; *Skop*, 485 F.3d at 1144–45. Finally, in *Kjellsen*

*v. Mills*, where an officer arrested the plaintiff for driving under the influence, we

concluded that probable cause existed throughout his prosecution without

considering whether a seizure pursuant to legal process had occurred. 517 F.3d

1232, 1235, 1238 (11th Cir. 2008).

   This Circuit has a well-established approach to resolving conflicts in our

precedent. We are "obligated, if at all possible, to distill from apparently

conflicting prior panel decisions a basis of reconciliation and to apply that

reconciled rule." *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993).

When making this determination, we are mindful that only the holdings of prior decisions bind us. *See CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1338 (11th Cir. 2017). If we cannot reconcile our caselaw, we must follow the earliest precedent that reached a binding decision on the issue. *See id.*; *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* § 36, at 303 (2016). Here, our earliest decisions asked whether the judicial officer who made the probable-cause determination had sufficient, truthful information to establish probable cause. *E.g.*, *Kelly*, 21 F.3d at 1554; *Garmon*, 878 F.2d at 1409. We must follow those earlier decisions and not later decisions that conflict with them.

Under our framework for conflicting precedent, we can read *Grider v. City of Auburn*, 618 F.3d 1240, as applying the correct standard of probable cause. Although it mentioned the false-arrest standard when discussing malicious prosecution, it concluded that the seizure at issue lacked probable cause by considering what the "affidavit charging [the plaintiff] . . . stated." *Id.* at 1256–58. In other words, it held the officer liable only after concluding that the defendant's warrant affidavit lacked probable cause, so it is not in conflict with our earliest decisions. But we decline to follow *Grider* to the extent it held that the standards for malicious prosecution and false arrest are coextensive or that a plaintiff can prevail on a claim of malicious prosecution without establishing that the legal process justifying his seizure was invalid.

We can also reconcile other decisions in our later line of precedent by acknowledging a limited role for the arresting officer's knowledge in considering the constitutionality of warrant-based seizures. Even if an arrest warrant is invalid, we have held that a seizure is still constitutional if it would be reasonable without a warrant. *See, e.g.*, *Wilson v. Attaway*, 757 F.2d 1227, 1239 (11th Cir. 1985); *United States v. Francis*, 487 F.2d 968, 971–72 (5th Cir. 1973). This rule is compatible with the decisions in our line of precedents with an earlier origin, each of which, for different reasons, had no need to consider it. Some of these decisions had determined elsewhere that the arresting officer lacked probable cause. *See Kucynda*, 321 F.3d at 1081; *Garmon*, 878 F.2d at 1410; *see also Grider*, 618 F.3d at 1258; *Jones*, 174 F.3d at 1284. Another considered a pretrial detention that was too long to be justified as a warrantless seizure. *See Kelly*, 21 F.3d at 1548. And the remaining two held that the warrant at issue was valid, so the seizure was constitutional. *See Paez*, 915 F.3d at 1288; *Black*, 811 F.3d at 1267.

Admittedly, this rule has little use in most suits challenging pretrial detention. Regardless of the strength of the evidence, "persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause." *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991). So only a "brief period of detention" is lawful without some form of legal process. *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975); *see also Riverside*, 500

U.S. at 57 (holding that detentions of more than 48 hours without a judicial determination of probable cause are presumptively unconstitutional).

Notwithstanding the limits of this rule, we read it to apply to *Wood v. Kesler*, 323 F.3d 872, and *Carter v. City of Melbourne*, 731 F.3d 1161, two decisions that considered only seizures pursuant to a warrant. Because *Wood* both held that the officer had probable cause when the arrest occurred and considered a seizure that lasted only a few hours, *Wood*, 323 F.3d at 876, 882, it correctly resolved the claim of malicious prosecution in such a way that made the validity of the warrant "immaterial," *Francis*, 487 F.2d at 972. Like *Wood*, *Carter* held that an officer's probable cause justified a seizure pursuant to a warrant. 731 F.3d at 1170. And because *Carter* did not discuss the length of the seizure at issue, it does not foreclose the potential that this rule applied. *See id.* (mentioning only that the plaintiff was "detain[ed]" following the arrest). When a decision "leave[s] open the possibility" of applying a basis for reconciliation, we need not read that decision as conflicting with earlier precedent. *Robinson v. Tanner*, 798 F.2d 1378, 1383–84 (11th Cir. 1986).

The remaining two decisions create no conflict in our caselaw because their discussions of the applicable standard for probable cause were dicta. Our decision in *Blue v. Lopez* stated that a court should "measure[] whether the defendant had probable cause" only in passing, and that statement did not affect its ruling. *See*

901 F.3d at 1359. And *Lowe v. Aldridge* concerned only a claim that a search pursuant to a warrant was unlawful, so its discussion of the standard for arrest warrants was also dicta. *See* 958 F.2d at 1568–70; *see also Paez*, 915 F.3d at 1285 (distinguishing search and arrest warrants).

In sum, we can reconcile our precedents by clarifying a plaintiff's burden to prove "a violation of her Fourth Amendment right to be free of unreasonable seizures." *Paez*, 915 F.3d at 1285 (internal quotation marks omitted). To meet this burden, a plaintiff must establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process. We turn next to the application of that reconciled rule.

c.  Williams Has Established a Genuine Issue of Fact Over Whether He Suffered an Unconstitutional Seizure Pursuant to Legal Process.

To prevail on his Fourth Amendment claim, Williams must establish that the legal process justifying his seizure—the arrest warrant that listed two charges for attempted murder—was constitutionally infirm and that his seizure would not otherwise be justified without legal process. Williams can prove that his arrest warrant was constitutionally infirm if he establishes either that the officer who applied for the warrant should have known that his application failed to establish probable cause, *Black*, 811 F.3d at 1267; *Kelly*, 21 F.3d at 1553; *Garmon*, 878 F.2d at 1409–10; *see also Malley v. Briggs*, 475 U.S. 335, 344–45 (1986), or that an official, including an individual who did not apply for the warrant, intentionally or

recklessly made misstatements or omissions necessary to support the warrant, *see Paez*, 915 F.3d at 1283, 1287, 1291; *Black*, 811 F.3d at 1263–64, 1267; *Kucynda*, 321 F.3d at 1083; *Kelly*, 21 F.3d at 1554–55; *see also United States v. Leon*, 468 U.S. 897, 923 n.24 (1984) (explaining that the requirements of the Fourth Amendment extend to officers "who provided information material to the probable-cause determination"); *Franks*, 438 U.S. at 155–56; *Jones*, 174 F.3d at 1284–85 (applying this standard to a probable-cause hearing). As discussed above, Williams need only prove that probable cause was absent for at least one of the two attempted murder charges that justified his seizure. And finally, he will prevail only if his seizure would not have been constitutional without legal process.

Williams has presented a genuine dispute of fact about whether his seizure was unconstitutional. He does not contend that the officer who applied for his arrest warrant should have known that the application was invalid. After all, neither Aguirre nor Haluska was the "complaining witness" who applied for the warrant and who would be liable for a facially invalid warrant application. *Rehberg*, 566 U.S. at 370. Williams instead argues that the warrant application falsely reported that he "present[ed] a firearm and point[ed] it at" Aguirre and Haluska. Nobody contests that a genuine dispute of fact exists over whether that statement is false: Williams says he never pointed a gun at the officers. The officers maintain that he did. So we assume that the statement was false and

consider (1) whether it was "made either intentionally or in reckless disregard for the truth and, if so, (2) whether, after deleting the misstatement[], the affidavit is insufficient to establish probable cause." *Paez*, 915 F.3d at 1287 (quoting *United States v. Kirk*, 781 F.2d 1498, 1502 (11th Cir. 1986)). We resolve both issues in favor of Williams.

Williams first bears the burden of creating a genuine dispute about whether the officers' accusation against him was intentionally false and not, for example, a mistaken belief on the part of the officers. "[G]eneral attacks upon [a] defendant's credibility" are not enough to meet this burden. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). Nor are conclusory allegations and speculation. *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015). Instead, Williams must "identify affirmative evidence from which a jury could find that" the officers lied when they stated that he pointed a gun at them. *Crawford-El*, 523 U.S. at 600. This question, of course, is separate from the underlying dispute over whether Williams in fact pointed his gun at the officers. *See id.*

We agree with Williams that the record presents a genuine dispute about whether the misstatement in the warrant application was "made either intentionally or in reckless disregard for the truth." *Paez*, 915 F.3d at 1287 (internal quotation marks omitted). Although the question whether Williams pointed a gun at the officers is distinct from whether the officers lied, the two are closely linked in this

appeal. The officers detail a multi-step progression of events between when Williams allegedly drew his gun and when Aguirre shot Williams—under one account, for example, Williams first pointed the gun at each officer, then went on his knees in response to Aguirre's commands, and then pointed his gun again at Aguirre. But almost none of these events could have occurred if Williams is correct that he never drew his gun or pointed it at the officers. And the chances are low that both officers were subjectively mistaken about every event in this series. In other words, the record supports an inference that *someone* is lying. And if the jury credits Williams's testimony that he did not draw his gun, then it could also infer that the officers' accusations were intentionally false.

That the officers failed to maintain a consistent narrative reinforces this conclusion. On the day of the shooting, the officers stated that Williams pointed a gun at each of them once before Aguirre shot him—specifically, that Williams first pointed a pistol at Haluska and then at Aguirre, which led Aguirre to shoot Williams. These statements, which reported that Williams "backed up and pointed a pistol" and later "went down" or "fell to the ground" after Aguirre shot him, also could be read to suggest that Williams was standing when shot. The officers' narrative shifted after they saw the video, which revealed that Williams was on his hands and knees when Aguirre shot him. Haluska then stated that Williams pointed the gun at each officer when on his knees or that Williams pointed his gun at each

officer when standing and then pointed his gun at Aguirre a second time when he was on his knees. Aguirre stated that he shot Williams after Williams "sat the bag down" and "came up with" a pistol that he pointed at both officers, which suggests that Williams was standing. And yet, Aguirre also insisted that Williams was on the ground when the shooting occurred.

A reasonable jury could infer from these inconsistencies that the officers' statements were intentionally false. The jury could find that the initial statements differed from the video in ways that suggest more than a reasonable mistake, such as whether Williams was standing when Aguirre shot him. It also might find that the officers' shifting narratives reflected an attempt to reconcile their statements with the video footage. In short, a reasonable jury could find that the officers lied when they accused Williams of pointing a gun at both of them. *See Kingsland*, 382 F.3d at 1226–28 (holding that officers' actions during and after an arrest provided circumstantial evidence that the officers fabricated evidence).

We also agree that the misstatement in the affidavit was necessary to establish probable cause. Indeed, probable cause evaporates "after deleting the misstatement[]," *Paez*, 915 F.3d at 1287 (internal quotation marks omitted), because it was the only fact in the affidavit supporting probable cause for attempted murder. Of course, an affidavit does not support probable cause if it lacks any facts that suggest a crime occurred. *See, e.g.*, *Garmon*, 878 F.2d at 1410.

Williams's pretrial detention also could not be justified as a warrantless arrest. Although the officers argue at length that they had at least arguable probable cause to arrest Williams for attempted murder, we need not resolve whether they are correct. Even if the officers had probable cause to arrest Williams for attempted murder, Williams's seizure was far too long to be justified without legal process. *See Riverside*, 500 U.S. at 57. And because a genuine dispute of material fact exists about whether the warrant was invalid as to at least one charge in the arrest warrant, we hold that Williams has met his burden to establish a genuine dispute of fact about whether he was seized in violation of the Fourth Amendment.

## 2.  The Officers Caused Williams's Injury.

As a fallback, the officers argue that Williams cannot prove that they caused his extended pretrial detention. *See Baker*, 443 U.S. at 142 ("[A] public official is liable under § 1983 only if he *causes* the plaintiff to be subjected to [a] deprivation of his constitutional rights." (internal quotation marks omitted)); *Paez*, 915 F.3d at 1285 (explaining that the common-law elements of malicious prosecution require the plaintiff to prove that the defendants "caused damage to" him (internal quotation marks omitted)). They explain that Williams's detention occurred only because the district attorney decided to pursue charges and a grand jury indicted him. According to the officers, these actions broke the causal chain between their actions and any injuries from Williams's seizure.

We again disagree. Because Williams complains he was seized in violation of the Fourth Amendment, the relevant injury is the seizure that followed the arrest warrant, not the broader prosecution. *See Whiting*, 85 F.3d at 584 ("[T]he Fourth Amendment protects against 'searches' and 'seizures' (and not 'prosecutions') . . . ."). So causation turns on whether "the defendants were responsible for [Williams's] continued incarceration." *Kelly*, 21 F.3d at 1557; *see also Malley*, 475 U.S. at 344 n.7 ("[Section] 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." (internal quotation marks omitted)). If the officers were responsible for only the warrantless arrest, then causation might not exist. *See Eubanks v. Gerwen*, 40 F.3d 1157, 1160–61 (11th Cir. 1994). After all, any extended pretrial seizure requires a "judicial determination of probable cause," *Gerstein*, 420 U.S. at 114, which often severs the causal chain between a warrantless arrest and pretrial detention, *see Barts v. Joyner*, 865 F.2d 1187, 1195–96 (11th Cir. 1989). But, to reiterate, Williams has raised a genuine dispute over the constitutionality of his seizure pursuant to legal process. And that dispute turns on whether the officers intentionally provided materially false statements to support the arrest warrant that justified at least part of that seizure. Both at common law and under our precedent, such false statements would be enough to establish a claim of malicious prosecution. *See, e.g.*, *Kelly*, 21 F.3d at 1553–55; Thomas M. Cooley, *A Treatise*

*on the Law of Torts* 187 (Chi., Callaghan & Co. 1880) ("All concerned in originating and carrying on a malicious prosecution are jointly and severally responsible; it is not necessary that all should have been complainants.").

We acknowledge that a grand-jury indictment also justified part of Williams's detention, and we have not resolved whether an indictment will sever liability for an officer who lied to obtain an arrest warrant. Indeed, dicta in our precedent suggests different conclusions. *Compare Jones*, 174 F.3d at 1286–88 (stating that a defendant who was responsible for false statements in a warrant affidavit would not be liable for any seizure that followed an indictment), *with Barts*, 865 F.2d at 1195 (stating that an indictment would not break the chain of causation if "plaintiff can show that [it was] the result of deception or undue pressure by the defendant policemen"). Although grand-jury witnesses are absolutely immune from liability based on their testimony, *see Rehberg*, 566 U.S. at 369, the Supreme Court has suggested that a plaintiff could maintain a claim under the Fourth Amendment for a seizure that followed an indictment, *see Manuel*, 137 S. Ct. at 920 n.8. Likewise, other circuits allow claims for seizures that follow a grand-jury indictment if the officer's nontestimonial actions tainted the indictment. *See, e.g.*, *King v. Harwood*, 852 F.3d 568, 584 (6th Cir. 2017); *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015).

That said, we need not resolve the effect of the indictment in this appeal. Because Williams, like the plaintiff in *Jones*, was seized pursuant to the purportedly invalid warrant *before* the district attorney obtained the indictment, the arrest warrant was the sole justification for his initial seizure pursuant to legal process. So the effect of the indictment is a question of damages, which are not determinative of qualified immunity. *See Kelly*, 21 F.3d at 1557 ("[A] failure by [the plaintiff] to show . . . an actual injury would not necessarily entitle the defendants to summary judgment on the damages issue. When constitutional rights are violated, a plaintiff may recover *nominal* damages even though he suffers no compensable injury.").

### 3.  Williams Had a Clearly Established Right To Not Be Seized Based on Intentional and Material Misstatements in a Warrant Application.

To overcome qualified immunity, a plaintiff must also prove that the defendant violated a constitutional right that was "clearly established" when the violation allegedly occurred. *Gaines v. Wardynski*, 871 F.3d 1203, 1206 (11th Cir. 2017) (internal quotation marks omitted). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). A constitutional right is clearly established only if "every reasonable official would interpret [controlling precedent] to establish the particular [right] the plaintiff seeks to apply" and "the unlawfulness of

the officer's conduct . . . follow[s] immediately from the conclusion that [the right] was firmly established." *Id.* at 590 (internal quotation marks omitted); *see also Hamilton ex rel. Hamilton v. Cannon*, 80 F.3d 1525, 1531 (11th Cir. 1996) (holding that dicta cannot "clearly establish[] the law").

Williams contends, and we agree, that under his version of the facts the officers violated his clearly established rights under the Fourth Amendment. More than three decades before the officers accused Williams of attempted murder, the Supreme Court held that a search warrant was void when an officer's lie was necessary for the warrant to establish probable cause. *See Franks*, 438 U.S. at 156. By the time of Williams's detention, we had concluded that "the law [is] clearly established . . . that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen . . . if such false statements were necessary to the probable cause." *Jones*, 174 F.3d at 1285. This prohibition applies when an arrest affidavit "is insufficient to establish probable cause" without an officer's false statement, *Kirk*, 781 F.2d at 1502; *see also Paez*, 915 F.3d at 1287, unless the seizure could have been supported as a warrantless arrest, *see Wilson*, 757 F.2d at 1239. And it extends to any officer "who provided information material to the probable cause determination." *Kirk*, 781 F.2d at 1503 & n.5 (quoting *Leon*, 468 U.S. at 923 n.24); *see also Garmon*, 878 F.2d at 1408, 1410 (holding that a police

officer who directed another agent to file an infirm warrant affidavit was liable for the ensuing unconstitutional seizure).

To be sure, our precedents on malicious prosecution were unsettled when the officers accused Williams, but those doctrinal tensions concerned only the relationship between Fourth Amendment violations and malicious prosecution, the vehicle that we have held controls liability for these violations. *Cf. Reichle*, 566 U.S. at 670 (holding that qualified immunity applies when intervening decisions "inject[] uncertainty into the law"). We have never wavered about the prohibition of misstatements in warrant applications. Of our decisions that determined probable cause from the information known to the arresting officer, only two considered warrant-based arrests. *See Carter*, 731 F.3d at 1166; *Wood*, 323 F.3d at 876. And neither of those decisions could have implicated our standard for misstatements in warrant applications. *See Carter*, 731 F.3d at 1170 (holding that the plaintiff failed to offer "any evidence" that probable cause did not exist for his seizure); *Wood*, 323 F.3d at 876 n.5 (stating that the plaintiff failed to allege that any particular statements of the officer were false). Our prohibition of intentional, material misstatements in warrant applications has long been a cornerstone of this Court's jurisprudence on the validity of warrant-based seizures. *See, e.g.*, *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009); *Jones*, 174 F.3d at 1285. In the light of this uncontroverted and well-established rule, we readily

conclude that "every reasonable official would interpret [our precedents] to establish" that intentional, material misstatements in warrant applications violate the Constitution. *Wesby*, 138 S. Ct. at 590.

Further, the "unlawfulness of the officer[s'] conduct . . . follow[s] immediately from the conclusion that [the right] was firmly established." *Id.* (internal quotation marks omitted). A reasonable jury could find that the officers' accusations that Williams pointed a gun at them were intentionally false, and if we delete those false accusations from the warrant applications, no facts remain to support probable cause for attempted murder. So under Williams's version of events, the officers "knowingly [made] false statements in an arrest affidavit about the probable cause for an arrest in order to detain" Williams, and those "false statements were necessary" for the affidavit to prove probable cause. *Jones*, 174 F.3d at 1285; *see also Paez*, 915 F.3d at 1287. Additionally, Williams's detention was plainly too long to be justified as a warrantless arrest. *See Riverside*, 500 U.S. at 57.

Because Williams has established a genuine dispute over whether the officers violated his clearly established rights under the Fourth Amendment, the officers are not entitled to qualified immunity at this stage of the suit. Notwithstanding the ambiguity in our standard of malicious prosecution, Williams had a clearly established right to be free from a seizure based on intentional and

material misstatements in a warrant application. And if the jury credits Williams's version of events, the officers' conduct violated that right.

### B. The Officers Are Not Entitled to State-Agent Immunity.

The officers argue that state-agent immunity defeats Williams's claim against them for malicious prosecution under Alabama law. State-agent immunity shields government officials acting within their discretionary authority from liability unless federal or state laws "enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise" or the officer "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex parte Harris*, 216 So. 3d 1201, 1208–09 (Ala. 2016) (internal quotation marks omitted); *see also* Ala. Code § 6-5-338(a). Williams agrees that the officers acted within the scope of their discretionary authority, so he bears the burden of proving that an exception to immunity applies.

Williams argues, and we agree, that the officers are not entitled to summary judgment based on state-agent immunity because a genuine dispute of fact exists about whether the officers acted maliciously. *See Harris*, 216 So. 3d at 1209 (holding that state-agent immunity does not apply if the defendant acted maliciously). To meet his burden, Williams must offer substantial evidence that the officers acted "without justification or excuse" and with "[t]he intent . . . to commit

a wrongful act." *Ex parte Nall*, 879 So. 2d 541, 546 (Ala. 2003) (internal quotation marks omitted); *see also Harris*, 216 So. 3d at 1215 (holding that maliciousness requires conduct "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith" (internal quotation marks omitted)). As explained earlier, a reasonable jury could find that the officers lied when they accused Williams of pointing a gun at them. Because that finding would make clear that the officers acted maliciously, *see Ex parte City of Tuskegee*, 932 So. 2d 895, 907 (Ala. 2005) (holding that a plaintiff who alleged that officers fabricated evidence against him could prove that the officers acted maliciously), the district court did not err in denying Aguirre's and Haluska's motions for summary judgment based on state-agent immunity.

## IV. CONCLUSION

We **AFFIRM** the denial of qualified and state-agent immunity for Officers Aguirre and Haluska.