[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13170

Non-Argument Calendar

_____

RALPH HOLMES,

Plaintiff-Appellant,

*versus*

THE CITY OF FT. PIERCE, FLORIDA,
a political subdivision of the State of Florida,

Defendant-Appellee,

DIANE HOBLEY-BURNEY,
as the Chief of Police for the City of Ft. Pierce, Florida, and
in her individual capacity, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:18-cv-14461-JEM

_____

Before WILSON, ROSENBAUM, and LUCK, Circuit Judges.

PER CURIAM:

Ralph Holmes, a white male, appeals the district court's summary judgment for the City of Fort Pierce on his racial discrimination claims under Title VII and 42 U.S.C. sections 1981 and 1983. After a thorough review, we affirm.

## FACTUAL BACKGROUND

### Officer Holmes's Work History

In 2003, Officer Holmes was hired by the city as a probationary police officer. During this probationary period, Officer Holmes was placed on administrative leave, investigated, and ultimately disciplined "for showing nude photos of a female co-worker at work." After his probation ended, Officer Holmes was assigned to road patrol. In 2004, Officer Holmes was issued a written reprimand for violating a policy—which he admitted he knew and violated anyway—against initiating vehicle chases. In 2005, he was

issued a written warning for violating a policy requiring an officer to "have a departmental void form signed by a supervisor" before a traffic citation can be voided.

In May 2009, Officer Holmes was reassigned to the police administration unit, where he was "responsible for training other officers, facilitating orders from the armor [sic], maintaining officers' certifications, and ensuring compliance with the Florida Department of Law Enforcement (FDLE) requirements." One of Officer Holmes's tasks was "assisting in the collection" of a kind of banned handcuffs—with "hinges"—and assigning new handcuffs that had chains. In 2010, while still in administration, Officer Holmes was issued a written warning for failing to report to work.

In January 2016, Officer Holmes was transferred back to road patrol at his request.

### The Semer Stop

On April 23, 2016, just before midnight, Officer Holmes was on duty and saw Demarcus Semer, an African-American male, drive by; Mr. Semer was traveling approximately twenty miles per hour over the speed limit in a residential neighborhood. Officer Holmes pursued, first turning on his lights and, when Mr. Semer did not immediately stop, briefly activating his siren. Officer Holmes saw the car "shake, which indicated the driver could be retrieving or concealing an item." He called dispatch and reported the car's tag number but did not call for backup. After Mr. Semer pulled over, Officer Holmes approached the car and asked for Mr.

Semer's driver's license.  At the same time, another officer, Sergeant Brian MacNaught, arrived and approached the passenger side.

Officer Holmes smelled marijuana and saw a small amount of shake[1] next to the steering wheel.  He told Mr. Semer to exit the car, but Mr. Semer refused.  Officer Holmes repeated himself and told Mr. Semer that he saw the marijuana.  Officer Holmes then tried to physically extract Mr. Semer from the car:  to do so, Officer Holmes reached in the window and opened the door.  But while Officer Holmes was trying to extract Mr. Semer, Mr. Semer drove off, knocking Officer Holmes to the ground and injuring him.  Sergeant MacNaught, who had been halfway in the passenger side when Mr. Semer drove off, jumped into the car.  Officer Holmes then fired two rounds into the vehicle, aiming "where he thought [Mr. Semer]'s head and neck were going to be to stop the vehicle."  One of the bullets hit the passenger side trunk, in the direction of Sergeant MacNaught.

After Officer Holmes fired at the car, Mr. Semer stopped the car, exited it, and ran.  Sergeant MacNaught drew his weapon and followed, assuming that Mr. Semer had fired the shots because it was "inconceivable to him" that Officer Holmes would have fired at the vehicle knowing that Sergeant MacNaught was inside.  Mr. Semer turned and raised his hand, in which he "presumably" held his cellphone but, based on the struggle in the car and the gunshots,

---

[1]  Shake, we're told, is "marijuana seeds or remnants."

Sergeant MacNaught thought he was holding a firearm. Sergeant MacNaught thought Mr. Semer was about to shoot him and so, "fearing for his life," he shot Mr. Semer, killing him.

### The Aftermath

Several investigations were conducted after Mr. Semer's death. A grand jury determined that the officers' use of force was objectively reasonable under the manslaughter statutes. But an internal investigator found: "1) [Officer] Holmes failed to follow training he had generated and presented in the past with respect to executing a physical extraction; 2) acted 'inherently dangerous' [sic] when he discharged his weapon; 3) expressed a lack of willingness to learn from this experience; 4) failed to comply with a supervisor's instruction to have his car camera fixed and seek training on its use; and 5) possessed an unauthorized rifle at the time of the stop."

Deputy Chief Kenny Norris reviewed the internal investigator's findings and concluded that Officer Holmes violated twelve department policies, including "possession of an unauthorized firearm; possession of unauthorized handcuffs; . . . insubordination associated with his failure to comply with a supervisor's instruction; and failure to demonstrate general proficiency." Deputy Chief Norris sent his findings to Chief Diane Hobley-Burney.

Chief Hobley-Burney, an African-American female, found that Officer Holmes made several errors in the way that he handled the stop. The chief found that: (1) Officer Holmes failed to call for

backup when he believed that the driver was retrieving or concealing something; (2) Officer Holmes did not comply with his training regarding officer demeanor; (3) he failed to ask Mr. Semer to turn off the engine even though he planned to arrest Mr. Semer and physically pull him out of the car; (4) Officer Holmes "fail[ed] to locate [Sergeant] MacNaught beside him prior to attempting the physical extraction and arrest" which "violated the very training [Officer] Holmes designed and taught within the department"; (5) Officer Holmes "fail[ed] to use good judgment when executing the extraction and wrapping himself between the window and open door of the car"; (6) he failed to consider "postponing" Mr. Semer's arrest once he had given dispatch the car's tag number and had Mr. Semer's driver's license; and (7) Officer Holmes failed to use good judgment when he fired his gun at a fleeing vehicle, firing in the same direction as another officer, while in a residential neighborhood. Chief Hobley-Burney found each of these to be a significant violation of the police department's policies and procedures.

The chief also determined that Officer Holmes had "disregarded" several other policies by having an unauthorized long gun and unauthorized hinged handcuffs and by failing to follow his supervisor's orders to get the camera system in his patrol car fixed and to get trained on the system's proper use. She found that these violations showed Officer Holmes's lack of respect for the department's rules and that, in particular, his failure to maintain and use his car's camera system showed his lack of respect for the department's philosophy of "community-oriented policing."

Chief Hobley-Burney recommended that City Manager Nicholas Mimms terminate Officer Holmes's employment because she found that his "flagrant lack of respect" for the rules and "utter refusal" to follow them or take responsibility for his actions would not be improved by training or discipline. City Manager Mimms, an African-American male, agreed with the chief's recommendation, and terminated Officer Holmes's employment on May 8, 2017.

The city's charter created a civil service appeals board that "hear[d] appeals of any person in the classified service who [was] dismissed, demoted, suspended[,] or transferred." Officer Holmes's collective bargaining agreement permitted him to either file an appeal with the civil service appeals board or "pursu[e] a grievance through arbitration . . . . Under either process, the department head's or city manager's termination decision could be sustained, reversed[,] or altered." Officer Holmes chose to pursue arbitration rather than appealing through the civil service appeals board.

## PROCEDURAL HISTORY

In 2019, Officer Holmes sued the city, alleging that the African-American chief of police and city manager fired him because he was white, in violation of 42 U.S.C. sections 1981 and 1983 and Title VII. The city moved for summary judgment. It argued, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that the city didn't have an official policy of discriminating against

white police officers and that City Manager Mimms's decision to fire Officer Holmes was not an official policy or custom because City Manager Mimms was not a final policymaker. The city also argued that Officer Holmes had not made a prima facie case of discrimination because he had not shown that the city treated similarly situated non-white employees more favorably than him.

Officer Holmes responded that City Manager Mimms was the final policymaker because he, and not the arbitration panel, had "ultimate authority" over employment decisions. Officer Holmes also argued that he "ha[d] asserted several instances of fellow similarly situated minority police officers (i.e. of the same rank) being disciplined differently by the same individuals" for conduct that, he argued, was "far more egregious in terms of 'quality,'" than his conduct, including insubordination, "lying under oath on a job application, associating with 'known convicted felons,' committing a potential crime regarding [f]ederal housing assistance . . . ; removing a duty belt to fight a suspect; and also getting engaged in a physical altercation at an adult men's club while off duty."

The district court granted the city's motion for summary judgment on the sections 1981 and 1983 and Title VII claims. First, the district court explained that to prevail on the section 1981 claim, brought through section 1983, Officer Holmes "must show that the discrimination was a result of the [c]ity's policy or custom." It was undisputed, the district court ruled, (1) that "City Manager Mimms, together with Police Chief Hobley-Burney, terminated [Officer] Holmes'[s] employment," and (2) that the city charter

"expressly creates" a civil service appeals board that "has the power to affirm, disaffirm, reverse[,] or modify any adverse employment action against an employee of the City of Fort Pierce." The district court concluded that, because the civil service appeals board had the power to reverse the city manager's employment decisions, City Manager Mimms was not the final policymaker in Officer Holmes's termination. That Officer Holmes also had access to independent arbitration did not change the civil service appeals board's status as the city's final policymaker.

Second, the district court granted summary judgment for the city on both the sections 1981 and 1983 and Title VII claims because Officer Holmes's proposed comparators were "not similar in all material respects" and so he was "unable meet his burden of establishing a triable issue with respect to circumstantial evidence of discrimination." None of the comparators had similar disciplinary histories to Officer Holmes, nor did they "engage in conduct of the same or similar magnitude"; "[n]o other comparator employee proffered by [Officer] Holmes was disciplined for use-of-force violations leading to the loss of life."

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment, using the same legal standards applied by the district court. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the movant has met this burden, we view the evidence in the light most favorable to the non-moving party. *Alvarez*, 610 F.3d at 1263–64.

## DISCUSSION

As to the sections 1981 and 1983 claim, Officer Holmes argues that the district court erred in concluding that City Manager Mimms wasn't the final policymaker in his termination. As to the Title VII claim, Officer Holmes contends that the district court erred in concluding that he did not show any comparator evidence to establish a prima facie case under *McDonnell Douglas.*[2]

*The Sections 1981 and 1983 Claim:*
*City Manager Mimms Was Not a Final Policymaker*

When a plaintiff sues a state actor under section 1981 for damages for an alleged violation of his rights, he must proceed under section 1983, as Officer Holmes has done. *See Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989) ("Congress intended that the explicit remedial provisions of [section] 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in [section] 1981."); *Butts v. County of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000) ("[A] plaintiff must use the remedial provisions of [section] 1983 to enforce against state actors the rights created by [section] 1981."). Under section

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

1983, a local government is responsible for an injury inflicted by its employee only when the injury is inflicted by the "execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. In other words, "[m]unicipal liability may arise with regards to an employment decision, such as a termination, provided that the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Quinn v. Monroe County*, 330 F.3d 1320, 1325 (11th Cir. 2003) (emphasis and quotation marks omitted).

A "decisionmaker" is not always a "policymaker." *Id.* at 1325–26. Therefore, it is up to the court to determine whether the decisionmakers are the final policymakers by "identify[ing] those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *McMillian v. Monroe County*, 520 U.S. 781, 784–85 (1997) (quotation marks omitted). To do this, we look to state law to understand the officials' actual functions and we look at the particular issue because an official may be a final policymaker for some actions but not others. *Id.* at 785–86.

"Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997). Meaningful administrative review is "review by a municipal official's superiors." *Carter*

v. City of Melbourne, 731 F.3d 1161, 1167 (11th Cir. 2013). It is the *opportunity* for meaningful review of an official's actions that prevents the official from being a final policymaker and precludes the city from being liable for that official's decisions. *Scala*, 116 F.3d at 1402–03. A decision is still subject to review even if individuals must file an appeal to have the decision reviewed, *id.* at 1402, and even if review was available but not performed, *Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1277 (11th Cir. 2000) (holding that review was available and the decisionmaker was not a final policymaker even though the plaintiff was denied review for not pursuing it in the required timely fashion).

It is undisputed that Officer Holmes was terminated by City Manager Mimms. And it is undisputed that City Manager Mimms had the power to terminate a police officer under the city's charter. But the charter also created the civil service appeals board, which was empowered to affirm, reverse, or modify adverse employment actions by City Manager Mimms.

City Manager Mimms's decision was therefore subject to meaningful administrative review by the civil service appeals board. Because this opportunity for review existed, City Manager Mimms was not the final policymaker. *See Scala*, 116 F.3d at 1403 ("Because the [c]ity [c]ivil [s]ervice [b]oard has the power to reverse any termination decision made by [the city manager] or [the department chief], neither of them is a final policymaker with respect to termination decisions.").

Officer Holmes relies on *Carter* to contend that, because the arbitration panel that reviewed his termination was not a final policymaker for the city, City Manager Mimms had to be the final policymaker in his termination. *See* 731 F.3d at 1167 ("An independent arbitrator, who is not otherwise an employee of the city, is not vested with final policymaking authority for the city."). Officer Holmes argues that this case is like *Carter*. It is, but not in a way that helps him.

In *Carter*, the acting police chief terminated the plaintiff, who then could appeal the termination internally to the city manager or externally to an independent arbitrator. *Id.* at 1166. The city argued that these "two sources of administrative review . . . made the decisions about which [the plaintiff] complain[ed] non-final." *Id.* at 1167. We disagreed with the city about the arbitrator but agreed with it about the city manager. *Id.* We held that the arbitrator could not be a final policymaker for the city because the arbitrator stood outside the city government and thus did not make policy for it. *Id.* But we also held that the plaintiff could not hold the city liable under a final policymaker theory because he "failed to present any evidence" that the city manager—who also had appellate review of the police chief's decision—"made the decision to fire him or ratified the decision." *Id.*

Here, City Manager Mimms terminated Officer Holmes, who then could appeal his termination internally to the civil service appeals board or externally to an arbitration panel. The arbitration panel stood outside the city government and thus could not be the

final policymaker in Officer Holmes's termination. *See id.* But City Manager Mimms's decision was not final because, just as the plaintiff in *Carter* could appeal internally to the city manager, Officer Holmes could appeal internally to the civil service appeals board. *See Scala*, 116 F.3d at 1403 n.5 ("[T]he availability of meaningful [b]oard review prevents termination decisions made by [the chief] or [city manager] from being 'final' for [section] 1983 purposes, and that precludes the [c]ity from being held liable for those decisions.").

Because City Manager Mimms was not a final policymaker for the city under *Monell*, the city could not be liable for City Manager Mimms's decision.

### The Title VII Claim: No Comparator Evidence

Officer Holmes next argues that the district court erred in concluding that he did not establish a prima facie case of discrimination because his suggested comparators were not similarly situated.

In circumstantial evidence cases like Officer Holmes's, we apply the *McDonnell Douglas* test, which first requires that the plaintiff make a prima facie case of discrimination. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). This prima facie case has four parts. *Id.* The plaintiff "must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he . . . was

20-13170                Opinion of the Court                15

treated less favorably than a similarly-situated individual outside his protected class." *Id.* The district court granted summary judgment because Officer Holmes failed to meet the fourth part: he did not point to similarly situated, non-white comparators who were treated less favorably than he was.

To satisfy the fourth part of the test, a plaintiff must show that he and his comparators were "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1226 (11th Cir. 2019) (en banc). Ordinarily, a similarly situated comparator will "have engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28. We do not look at "formal labels, but rather [at] substantive likenesses." *Id.* at 1228. Essentially, a similarly situated comparator should be someone who "in an objective sense . . . cannot reasonably be distinguished." *Id.* (quotation marks omitted).

The district court concluded that, although Officer Holmes proffered non-white comparators who were allegedly treated more favorably following their violations of department policies than he was following his, none of the comparators were similarly situated to Officer Holmes. The district court explained that the comparators "had very different disciplinary histories and did not engage in conduct of the same or similar magnitude as [Officer] Holmes."

We agree with the district court that Officer Holmes's suggested comparators were not similarly situated to him in all material respects.  Officer Holmes suggested five non-white potential comparators, but only one, Officer Tumblin, engaged in misconduct similar to his.  Officer Streeter engaged in no misconduct; he simply went on medical leave for injuries.  Officer Francois lied under oath on her job application by failing to disclose that her husband was a convicted felon.  Officer Mathura's misconduct involved an improper search and seizure, "conduct unbecoming" (he took off his duty belt to fight a suspect), and an off-duty altercation.  And Officer Saintilien engaged in one instance of insubordination in which he failed to follow Sergeant MacNaught's orders to go to police headquarters to watch a prisoner.

Officer Tumblin's misconduct was the most similar to Holmes's—he fired his weapon in the direction of a vehicle in a residential neighborhood.  However, Chief Hobley-Burney testified that the investigation into Officer Tumblin's shooting was ongoing because the department was still "looking for the suspect in the case" and that Officer Tumblin's case was "completely different from" Officer Holmes's.

Other than Officer Tumblin, Officer Holmes's alleged comparators did not engage in the same basic misconduct as Officer Holmes.  Even disregarding his violations of the department's handcuff, gun, and car camera policies, none of their misconduct was basically the same as shooting at a fleeing car, in the direction of another officer, in a residential neighborhood, during a traffic

stop that resulted in a suspect's death. Nor did their actions involve the same rules and policies.

As to Officer Tumblin, he and Officer Holmes were not similarly situated because they did not have similar disciplinary histories. Officer Holmes points to only one incident of potential misconduct by Officer Tumblin: like Officer Holmes, Officer Tumblin fired a gun at a car in a residential neighborhood. Because the investigation into Officer Tumblin's shooting is ongoing, he has not been disciplined for it. But even assuming the shooting becomes part of Officer Tumblin's disciplinary history, Officer Holmes's disciplinary history included more than just the incident that led to Mr. Semer's death. In 2003, Officer Holmes was placed on administrative leave for showing nude photos of a female coworker at work. The next year, he received a written reprimand for initiating a vehicle chase. The year after that, he received a written warning for failing to have a required form to void a traffic citation. Officer Holmes received another written warning in 2010 when he failed to report to work. And the investigation into Mr. Semer's death revealed that Officer Holmes had an unauthorized long gun and unauthorized hinged handcuffs and had not complied with orders to fix and get trained on his car's camera. This extensive disciplinary history showed Officer Holmes's failure, over several years, to follow a variety of departmental policies, both related and unrelated to Mr. Semer's death. Officer Holmes did not show that Officer Tumblin—or any of the other alleged comparators, for that matter—had a similarly extensive disciplinary history.

Because Officer Holmes did not present evidence of a similarly situated comparator, the district court did not err in granting summary judgment for the city. *See Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248 (11th Cir. 2020) ("The district court did not err in granting summary judgment on [the Title VII race discrimination] claim because [the plaintiff]'s proffered comparators were not similarly situated in all material respects.").[3]

**AFFIRMED.**

---

[3] Officer Holmes mentions the convincing mosaic theory of discrimination in his initial brief—but only in passing in one or two sentences at the tail end of his brief. Because he does not present the convincing mosaic theory sufficiently for our review, we do not discuss it further. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("[A]n appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").